**EQUAL EMPLOYMENT OPPORTUNI-
TY COMMISSION et al.,**

v.

**AMERICAN TELEPHONE AND TELE-
GRAPH COMPANY et al.**

Civ. A. No. 73–149.

United States District Court,
E. D. Pennsylvania.

Oct. 5, 1973.

**1108**

William H. Brown, III, Chairman, William A. Carey, Gen. Counsel, Charles F. Wilson, Associate Gen. Counsel, Isabelle R. Capello, Asst. Gen. Counsel, David Copus, Washington, D. C., for E.E.O. C.

Richard F. Schubert, Sol. of Labor, Carin Ann Claus, William Kilberg, Associate Sols. of Labor, Louis Weiner, Regional Atty., Washington, D. C., for Dept. of Labor.

J. Stanley Pottinger, David L. Norman, U. S. Asst. Attys. Gen., David L. Rose, James S. Angus, Washington, D. C., for Dept. of Justice.

Robert E. J. Curran, U. S. Atty., E. D.Pa., Charles Ryan, George E. Ashley, Harold S. Levy, Clark G. Redick, New York City, Bernard G. Segal, Irving R. Segal, Kimber E. Vought, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., Thompson Powers, James D. Hutchinson, Ronald S. Cooper, Steptoe & Johnson, Washington, D. C., for American Tel. and Tel. Co.

Richard H. Markowitz, Markowitz & Kirschner, Philadelphia, Pa., Charles V. Koons, Matthew A. Kane, Kane & Koons, Washington, D. C., for Communications Workers of America.

## OPINION

HIGGINBOTHAM, District Judge.

### I

### INTRODUCTION

Presently before the Court is a union's petition—Communications Workers of America (CWA)—challenging the implementation of the largest and most impressive civil rights settlement in the history of this nation. This monumental settlement was hammered out through the mutual, tenacious and lengthy efforts of the Equal Employment Opportunities Commission (EE OC), the United States Department of Labor, the United States Department of Justice, International Brotherhood of Electrical Workers (IBEW), and American Telephone and Telegraph Company (AT & T).[1]

This settlement is not the typical innocuous Consent Decree replete with pious platitudes that merely imply the parties promise not to discriminate again. Instead, this Consent Decree goes to the very heart of the system—money, goals, timetables, affirmative action programs, employee information programs, compliance monitoring, pay adjustments, new transfers and immediate promotion options.[2] Estimates of

---

1. AT & T is a colossal conglomerate comprised of twenty-four subsidiary companies and, when viewed together as a unit, constitutes the largest single private employer in the country.

2. The provisions of the Consent Decree have been reported at 1 CCH Emp. Prac. Guide ¶ 1860 at 1533-3 to 1533-14 (1973).

this landmark settlement are conservatively projected to cost AT & T $38,000,-000—$15,000,000 allocated as back wages to the victims of AT & T's purported discriminatory employment practices, and the remaining $23,000,000 to be expended for additional benefits created by the Decree.[3]

The parties labored long and ardously for almost two years to work out this Decree. In December 1970, the EEOC initiated administrative litigation before the Federal Communications Commission (FCC). Thereafter more than sixty days of hearings were conducted, entailing 150 witnesses, hundreds of exhibits and a record in excess of 8,000 pages.

While these efforts were being made to deal with the fundamentals of discrimination, CWA remained persistently aloof until two or three days before the Decree was signed. The aloofness was wilful and by choice, for CWA had been asked to participate in the negotiations leading to the Consent Decree, but it had steadfastly refused to become involved on any of the policy issues.[4]

Yet now CWA seeks to intervene as a plaintiff in this action pursuant to Rule 24(a) of the Federal Rules of Civil Procedure[5] and to deny enforcement of the Consent Decree until it can reach an independent agreement with the company on issues affecting wages, hours and conditions of employment. CWA would, furthermore, want to enjoin AT & T from enforcing the provisions of the Consent Decree should such implementation deviate in any way from the practices and procedures in operation under existing collective bargaining agreements negotiated with CWA. Thus, in not too subtle language, CWA seeks to delay the disbursement of $38,000,000 in funds and the implementation of thousands of new opportunities. CWA desires to stop these parties from correcting the deprivations which were sanctioned or tolerated during much of CWA's past association with AT & T.

Predicating its motion for intervention upon its status as the certified or recognized collective bargaining representative for approximately 600,000 non-management employees[6] of the named defendants CWA asserts that it is a "person aggrieved" and thus under 42 U.S.C.A. § 2000e–5(f)(1)[7] it has a statutorily conferred right to intervene unconditionally in this matter. Alternatively, CWA contends that none of the named parties in this suit adequately protect the interest of the union and consequently without intervention CWA's interest, as the exclusive bargaining agent for the aforementioned members and employees, would be substantially impaired and significantly undermined.

During the critical two year period from January 1971 to December 1972, CWA's sole actions before EEOC were

3. Notes of Testimony of January 18, 1973, Doc. No. 5 at 7–10.

4. Although CWA did participate in the conducting of a survey of its members for EEOC, there is no indication that CWA took any policy positions as to the implications of that survey.

5. Fed.R.Civ.P. 24 provides in relevant part: "(a) Intervention of Right. Upon timely application anyone shall be permitted to intervene in an action: (1) when a statute of the United States confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

6. Although the preponderance of the employees at AT & T are represented by CWA, some of the employees are represented by IBEW and other independent unions.

7. Section 706(f)(1) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f)(1), as amended, Pub.L.No.92–261, § 4(a) (March 24, 1972) states in pertinent part as follows:
"... the person or persons aggrieved shall have the right to intervene in a civil action brought by the Commission or the Attorney General in a case involving a government, governmental agency, or political subdivision. . . . "

limited to registering complaints in behalf of pregnant women employees against whom the union claimed AT & T had discriminatory policies as to maternity leaves. This issue as to pregnant women employees is either not significantly involved in the instant settlement, or if involved is at most minisculely related.

Despite the greatness of our country for many of its noble accomplishments, this nation, like most others, has also tragically failed, until most recently, to assure substantially equal options for women, blacks and many other groups. Where for two years CWA has been begged to enter the administrative arena to negotiate and litigate for the rights of those members who have presumably endured deprivations by reason of their sex or race, should CWA now be able to delay even for one hour the implementation of those rights which the union has consistently abdicated from pressing through the federal administrative options available? While I applaud the union's concern about the rights of pregnant women, its efforts in behalf of pregnant women is no basis to deprive the non-pregnant from having their rights protected. Since the non-pregnant have waited far too long for even a modest implementation of equal employment opportunities, I hold that on the facts of this record CWA cannot impede the enforcement of this very settlement for which it previously refused to seek or litigate.

I am not oblivious to the union's concern and sensitivity about maternity benefits for its female members. The union will be granted leave to intervene in this action to litigate the rights of pregnant female employees of AT & T, but such intervention will not operate to stay in any way the enforcement and implementation of the other provisions of the Consent Decree. Under the facts of this case and in view of the ample safeguards enunciated in the Consent Decree, CWA's motion for intervention as a matter of right is DENIED, except for the limited intervention granted pursuant to 42 U.S.C.A. § 2000e–5(f)(1).

When deciding this issue we are approaching uncharted seas without clear markings as to the rights of intervention. Thus in making this ruling I am not attempting to spell out for all time to come any definitive guidelines as to the right to intervene for those factual milieus which are significantly different than the present record. My holding must be limited to the unique facts of the instant litigation history, with consideration given to the extraordinary efforts which were made for almost two years to get CWA to act with the EEOC to participate in the administrative process.

## II.

### HISTORY OF THE CASE

A. *Preliminary Overview.*

Any exposition of the legal questions herein posited will be more clearly illuminated and enhanced when the chronology of events preceding this litigation is recited and the Court's rulings today are placed in a proper factual, as well as legal, perspective.

The CWA advances arguments of its purported desire now (at this late date) to participate in the formulation, fashioning and effectuation of remedies which would bring AT & T and its subsidiary companies into complete compliance with the relevant federal statutes. These arguments, though vigorously pressed, are in no slight degree belied and negatived by *its* past conduct and actions. As the facts are divulged one gleans from the record that the soundness of CWA's legal position, as repects the timely intervention under Rule 24(a)(2), cannot entirely be divorced and isolated from the union's consistent refusals to participate actively and to become involved extensively in the lengthy negotiations of the various Government officials and AT & T culminating in this historic civil rights settlement on January 18, 1973.

As the record conclusively establishes and as was previously noted at the outset, notwithstanding the repeated pleas, communicated by EEOC and other agencies, imploring CWA to undertake a more aggressive role during the two years of administrative litigation, it was not until January 16, 1973, two days before the entry of the Consent Decree that CWA manifested any indication that it might be abandoning its announced policy of non-intervention. In a letter of that date from Joseph A. Beirne, President of CWA, to Rex R. Reed, Vice-President, Labor Relations for AT & T, CWA demanded "immediate negotiations to commence at the American Telephone and Telegraph level" with regard to such matters as a transfer plan program, the job bidding and posting program and the promotional pay plan program, all items which had been subjects of the Government sessions.[8] Actually, it can be more correctly observed that CWA's demand for immediate negotiations with AT & T is also consonant with a finding of CWA's continuing preference for non-intervention in the Government proceedings. From the general tenor of the January 16th letter, it was demonstrably evident that CWA preferred to maintain its status as the exclusive bargaining agent for the employees of AT & T, and would rather stand off from the multiparty negotiations including governmental agencies as well as AT & T. Yet, apparently CWA does not now feel that its motion to intervene as a plaintiff should be rendered suspect or its ability to reach satisfactory agreements with AT & T will

be impeded and hampered even though EEOC, the Department of Labor and the Department of Justice are also plaintiffs in this action.

■ Equally important, the wording of the Consent Decree and the Memorandum of Agreement makes it indisputably obvious that CWA's rights were not infringed and in fact were more than adequately protected. The union's right to negotiate alternatives which are in full compliance with the applicable federal statutes is categorically preserved. Consistent with and in furtherance of this position AT & T is legally obligated to bargain in good faith with CWA and to endeavour to consider legally acceptable alternatives. Moreover, while there may have been some unilateral revisions of CWA's current contracts,[9] the changes were essential in order to rectify violations by AT & T of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq.; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended; and Executive Order 11246, 30 Fed.Reg. 12319, as amended.

B. *The FCC Litigation and Related Developments.*

The factual backdrop against which CWA's motion to intervene as a plaintiff must be viewed began almost three years ago on November 19, 1970, when AT & T filed with the FCC a revised tariff schedule providing for increases in rates for long distance message telephone service. (Transmittal No. 10989).[10] This increase was intended to raise AT & T's rate of return from 7.5 percent to 9.5 percent. Less than a

8. Affidavit of Rex R. Reed, Attachment 3 of Exhibit "A", Doc. No. 17, Amended Memorandum in Support of Defendants' Opposition to Motion for Communications Workers of America for Leave to Intervene.

9. Inasmuch as the CWA deliberately avoided participation in the preliminary negotiations, the CWA can hardly expect to escape criticism now and be absolved of any responsibility for the origin of their unilateral contract alterations. It ill-behooves the union to condemn now the unilateral nature of the

changes when this result was directly attributable to and in accord with its declared policy of non-intervention.

10. The facts surrounding the initial rate increase before the FCC have been taken from the Memorandum Opinion and Order of the FCC, released on January 21, 1971: In the Matter of Petitions filed by the Equal Employment Opportunity Commission, Docket No. 19143. (This Memorandum Opinion appears as Doc. No. 24 in the record of the instant case.)

month later, on December 10, 1970, EEOC filed a Petition to Intervene in the FCC proceedings, expressing its opposition to the rate increase request and alleging widespread racial and sex discrimination by AT & T. EEOC contended that the employment practices by AT & T violated Sections 201(b), 202(a), 214, 501 and 502 of the Communications Act of 1934, as amended; Sections 21.307 and 23.49 of the FCC's Rules and Regulations; Sections 703(a) and (d) of Title VII of the Civil Rights Act of 1964; the Civil Rights Act of 1866; the Equal Pay Act of 1963; Executive Order 11246; and the Fair Employment Practices Acts of numerous States and cities. Similar objections, in the forms of Petitions for Suspension of Rates, Hearing and Declaration of Unlawfulness, were raised by the National Association for the Advancement of Colored People (NAACP), National Organization for Women (NOW), the American Civil Liberties Union (ACLU), the California Rural Legal Assistance, Inc. (CLRA), the Mexican American Legal Defense Fund (MALD), and the American G I Forum.

In its Memorandum Opinion and Order of January 21, 1971, the FCC outlined and commented on its rules and regulations which demonstrated its long-standing concern that the communications common carriers adhere to a policy of non-discrimination. But it remarked in paragraph 8 of its Memorandum Opinion that:

". . . [N]o showing has been made as to any logical or functional relationship between rate levels and the company's policies and practices in the matter of equal employment opportunity. The EEOC has claimed, in Appendix A to its petition, that Section 202(a) of the Communications

Act of 1934, as amended, 47 U.S.C. 202(a), prohibits, 'on its face', employment discrimination by a carrier. We do not agree. The language in Section 202(a) is designed to protect the users of telecommunications services against discriminatory rates; it does not apply to the employees of a carrier except insofar as they may be discriminated against through rates and charges as users of the system.[11]

Accordingly, we feel that the petitions by the EEOC and others raising the issues of discriminatory employment practices should not be introduced in the subject rate hearing referred to above."

Nevertheless, the FCC concluded that the charges of the intervenors were not frivolous and should not go unheeded:

"9. We reaffirm our position that in divorcing these claims from the subject rate proceeding we are not intimating that they are without merit. On the contrary, we feel that the claims made by the EEOC and the other aforementioned organizations raise serious questions under those provisions of our rules requiring common carriers to show nondiscrimination in their hiring and employment policies. Accordingly, as we have already mentioned in our decision in Docket No. 19129 we are setting this matter down for a separate hearing to allow us to determine the outstanding questions of law and fact. We are including an issue herein as to whether and in what manner any of the alleged practices, if proved, affect revenues, expenses, and rates of AT & T. At the same time we are retaining jurisdiction in our proceeding in Docket No. 19129 to enable us to take any conclusions we may reach on the subject into account before finally disposing

---

11. Section 202(a) provides: "It shall be unlawful for any common carrier to make any unjust or unreasonable discrimination in charges, practices, classifications, regulations, facilities, or services for or in connection with like communications service, directly or indirectly, by any means of device, or to make or give any undue or unreasonable preference or advantage to any particular person, class of persons, or locality, or to subject any particular person, class of persons, or locality to any undue or unreasonable prejudice or disadvantage."

of the issues raised therein. Such procedures are designed to afford the petitioners full opportunity to make any relevant showing while at the same time ensuring due and orderly dispatch of our responsibilities to all interested parties."

The issues to be examined specifically in the separate FCC proceeding were:

"(A) Whether the existing employment practices of AT & T tend to impede equal employment opportunities in AT & T and its operating companies? Contrary to other purposes and requirements of the Commission's Rules and the Civil Rights Act of 1964.

"(B) Whether AT & T has failed to inaugurate and maintain specific programs, pursuant to Commission Rules and Regulations, insuring against discriminatory practices in the recruiting, selection, hiring, placement and promotion of its employees?

"(C) Whether AT & T has engaged in pervasive, systemwide discrimination against women, Negroes, Spanish-surnamed Americans, and other minorities in its employment policies?

"(D) Whether any of the employment practices of AT & T if found to be discriminatory, affect the rates charged by that company for its services, and if so, in what ways is this reflected in the present structure?

"(E) To determine, in light of the evidence adduced pursuant to the foregoing issues, what order, or requirements, if any, should be adopted by the Commission?"[12]

CWA intentionally mislabels and mischaracterizes the proceedings arising out of FCC Docket No. 19143 as being essentially a rate case.[13] This mischaracterization by CWA is urged on the Court notwithstanding the separate FCC designation of Docket No. 19143 for scrutiny of the discrimination claims against AT & T. Such a distorted reading by CWA of the FCC Memorandum Opinion does not comport with the actual facts as I perceive them.[14]

12. Id. at 5–6 of the FCC Memorandum Opinion.

13. In Doc. No. 19, the Supplemental Affidavit of Richard W. Hackler (an assistant to the President of the CWA and responsible for collective bargaining with AT & T), Mr. Hackler stated:

"With regard to Federal Communications Commission Docket No. 19143, the President and Executive Board of the CWA determined that it would not be in the best interests of CWA to intervene as a party of record in that proceeding, which was and is basically a rate case. It should also be noted that in the first half of 1971 CWA and AT & T and its operating subsidiaries were actively involved in negotiating or preparing to negotiate collective bargaining agreements to be effective upon expiration of the existing agreements in April and May, 1971. No agreement was reached, and there was a national strike against the Bell System in July, 1971. These agreements involved wage increases and other conditions of employment. In weighing the effect upon collective bargaining of intervention and active, aggressive participation in FCC Docket 19143, the Union determined that the best interests of its members would be served by informal participation.

"To this end, Charles McDonald of the President's staff cooperated fully and repeatedly with the EEOC, as set forth in detail in the affidavit of Mr. Copus. Mr. McDonald conducted a survey of Bell System practices and testified for the EEOC in the hearing. (Copus Exhibit A) However, it is true that CWA declined to formally intervene on the side of EEOC, for what it considered to be cogent policy reasons."

With all due deference to CWA's reasons for non-intervention, as will be noted below, the intensive negotiations between the Government and AT & T did not begin until the Fall of 1972, well over a year after CWA's national strike against the Bell Telephone System.

14. Compare similar comments found at 1–2 of Doc. No. 18, Reply Memorandum in Support of Motion of Communications Workers of America for Leave to Intervene as Plaintiff:

"Prior to January 18, 1973, there was no case or civil action number designating a cause of action which this proceeding now

On January 25, 1971, William H. Brown, III, Chairman of EEOC, had a luncheon meeting with Joseph Beirne, President of CWA, at which time the CWA was officially invited to join EEOC as a plaintiff in FCC Docket No. 19143; CWA respectfully declined to do so.[15]

During March 1971, David Copus, the EEOC attorney who spearheaded and co-ordinated the administrative litigation against AT & T, contacted CWA relative to intervention in the FCC proceedings. Once again, CWA stated it would not participate formally. Copus, however, did maintain additional conversations with CWA between March, 1971 and December, 1971, pertaining to the transfer and promotion policies of AT & T and what modifications might be necessary for compliance with Title VII. During this period Copus associated with Charles McDonald, an administrative assistant to CWA's President, in preparing a questionnaire to be sent by the CWA to a random sample of union members recently employed at AT & T. The questionnaire was mailed by CWA in October, 1971 and the results were tabulated by the CWA for EEOC. In November, 1971 McDonald also agreed to testify for EEOC in FCC Docket No. 19143 as to the results of the questionnaire.

On December 14, 1971, CWA's President wrote a letter to Robert D. Lilley, President of AT & T, noting his concern particularly about sex discrimination by AT & T and suggesting that they "begin discussions on this vital matter promptly." [16] Rex R. Reed, Vice-President, Labor Relations for AT & T, replied to this letter on January 24, 1972,

acknowledging AT & T's willingness to explore the subject further. While informal meetings occurred between AT & T and CWA over the next year and although AT & T continually apprised and updated CWA regarding the former's progress with EEOC, as was previously mentioned, it was not until January 16, 1973, that CWA insisted that immediate negotiations be initiated at the AT & T level.

Between August 11, 1971, and January 25, 1972, settlement discussions of EEOC and AT & T failed to resolve satisfactorily the employment discrimination questions and the FCC adversary hearing in Docket No. 19143 began officially on January 31, 1973. The proceedings, which extended over a year, involved approximately 60 days of hearings, the testimony of about 150 witnesses, the introduction into evidence of over 200 exhibits, and a record of about 8,100 pages.

While the foregoing hearings were being conducted, Copus (EEOC) met with Richard Hackler (an assistant to the President of CWA) on May 11, 1972, to discuss the impact AT & T's proposed Model Affirmative Action Program and Upgrade and Transfer Plan would have on CWA's collective bargaining agreements. EEOC disclosed then that it regarded the proposals by AT & T as having their shortcomings and being inadequate. CWA reaffirmed its earlier position that it did not wish to participate formally in FCC Docket No. 19143 and that any proposed changes by AT & T relative to CWA's contracts would have to be "grieved and arbitrated." Further, CWA was not willing to submit

---

embraces in which CWA could have legally intervened. The rate case the government alludes to in its responsive motion is not this case. The issues may involve similar questions; this, however, involves no rate making procedure; it deals directly with the implementation of the provisions of the Equal Pay Act, the Fair Labor Standards Act, Title VII of the Civil Rights Act, and compliance with Executive Order No. 11246 through the Office of Contract

Compliance. To suggest because CWA failed to intervene in the FCC case involving AT & T rates, in which the EEOC intervened, that there is thereby a waiver of the right to intervene in a totally different legal proceeding is ridiculous."

15. Affidavit of William H. Brown, III, Doc. No. 15.

16. In December 1971, Lilley was Executive Vice-President of AT & T.

any substantive proposals which EEOC could analyze as alternatives.

On September 15, 1972, Copus conferred with Leonard Sprague, Chairman of the Negotiation Committee for the Boston unit of IBEW, about the above proposals submitted by AT & T and their effect on IBEW's collective bargaining agreements with New England Telephone and Telegraph Company. IBEW subsequently filed a motion with FCC to intervene as a plaintiff in Docket No. 19143, which motion was granted on October 17, 1972.

On September 20, 1972, the General Services Administration (GSA), acting as the contract compliance agency enforcing Executive Order 11246 (and Revised Order No. 4 of the Office of Federal Contract Compliance), approved, with some modifications, AT & T's Model Affirmative Action Program and Upgrade and Transfer Plan. However, on September 28, 1972, Philip J. Davis, Acting Director of the Office of Federal Contract Compliance (OFCC), the agency within the United States Department of Labor which is charged with administering the Executive Order 11246 contract compliance program, notified an official of GSA that, pursuant to OFCC regulations 41 CFR 60–1.25, the OFCC was assuming jurisdiction of the matter involving AT & T and its operating companies' compliance with Executive Order 11246, as amended, and the Order's implementing rules and regulations including 41 CFR Part 60–2. On the same date, Mr. Davis also advised AT & T that in addition to the assumption of jurisdiction, OFCC's preliminary review indicated that the Affirmative Action Program submitted by AT & T to GSA did not appear to conform with the requirements of 41 CFR Part 60–2.

On October 6, 1972, Copus met again with Sprague and other IBEW representatives. At that time, a written proposal prepared by IBEW was considered, which, as applied to New England Tele-phone and Telegraph Company, would modify AT & T's proposals. EEOC, too, informed IBEW that the relief the former sought in FCC Docket No. 19143 exceeded that which was initially sanctioned by GSA on September 20, 1972, but since rejected and countermanded by OFCC.

After thoroughly reviewing the GSA-approved Agreement and Affirmative Action Program, William J. Kilberg, Associate Solicitor for Labor Relations and Civil Rights, United States Department of Labor, met on October 10, 19 and 24, 1972, with representatives of the Division of Fair Labor Standards of the Solicitor's Office, U.S. Department of Labor, which has the responsibility for enforcing the Equal Pay Act of 1963, and representatives of EEOC to discuss the issues surrounding the compliance posture of AT & T and the Bell Telephone System with Title VII of the Civil Rights Act of 1964; the Equal Pay Act of 1963 and Executive Order 11246.[17]

On October 17, 1972, Copus received a letter from AT & T requesting that negotiations to settle Docket No. 19143 be resumed. On the same day, he telephoned John Morgan, an assistant to Joseph Beirne, and informed him that further negotiations with AT & T were imminent and that these negotiations would concern modification of the Bell Telephone System plans approved by GSA on September 20, 1972. By letter dated October 17, 1972, a copy of a document drafted by Copus entitled "EEOC Analysis of Bell System Plans Approved by GSA" was transmitted to Mr. Morgan.

During the telephone conversation between Messrs. Morgan and Copus on October 17, 1972, discussions centered on how the EEOC's views as to remedy would require revision of both the GSA plan and the current Bell System transfer and promotion practices, including those contained in agreements with the CWA. Mr. Morgan was additionally informed that the IBEW had petitioned

17. Mr. Kilberg has the responsibility for representing OFCC in settlement negotiations and enforcement proceedings pursuant to Executive Order 11246.

the FCC to intervene in Docket No. 19143 and had submitted a written proposal to modify the Bell System Model Plans as they affected New England Telephone and Telegraph Company. Mr. Morgan revealed that the CWA still was neither inclined to participate as an intervenor in Docket No. 19143 nor submit to the EEOC any written proposals.

On October 26, 1972, Kilberg, together with representatives of the Division of Fair Labor Standards and the EEOC, commenced negotiations with representatives of AT & T to determine whether the GSA-approved Agreement and the AT & T Affirmative Action Program required further modification and amendment in order to comport fully with the requirements of Title VII of the Civil Rights Act of 1964, the Equal Pay Act of 1963 and Executive Order 11246.

On October 30, 1972, hearings resumed in Docket No. 19143 and continued until early January, 1973, when, at the request of EEOC and AT & T, the FCC Administrative Judge suspended the hearings pending the completion of settlement negotiations.

Meanwhile, attorneys for the IBEW contacted Kilberg by telephone shortly after the aborted GSA–AT & T agreement of September 20, 1972, was announced to raise some questions regarding the status of that agreement. Kilberg advised them of the possibility that OFCC might assume jurisdiction from GSA in that AT & T matter and that, if it did, the IBEW and other employee organizations which have collective bargaining agreements with the Bell Telephone System companies would be given an adequate opportunity to present their views to the Director or his legal counsel pursuant to 41 CFR 60–1.9(a). It was in fact the failure of GSA to allow affected labor organizations an opportunity to be heard which served as one of the many grounds for rejecting that agreement.

Thereafter, either Kilberg or Ronald Green, a member of Kilberg's staff and designated in the Labor Department as Counsel for Civil Rights, met with representatives of the IBEW on November 13, 1972, December 20, 1972, and December 29, 1972, in order to receive from the IBEW copies of the material submitted by them to the FCC in Docket No. 19143 and to discuss concerns which the IBEW had regarding the impact of any possible settlement or litigation on the interests and expectations of their members. In addition, Kilberg engaged in approximately twenty telephone conversations with IBEW representatives between September 29, 1972 and February 17, 1973. Similarly, several other meetings were held with representatives of the IBEW at its request, during the later stages of negotiations between OFCC and AT & T.

On December 14, 1972, Robert J. Williams, Director of Labor Relations for AT & T, also contacted Hackler of CWA to apprise him that AT & T was negotiating with EEOC and the United States Department of Labor. Subsequently, on December 19, 1972, Hackler was further advised that a settlement between AT & T and the Federal Government appeared imminent and that it involved approval of AT & T's Model Affirmative Action Program, Upgrading and Transfer Plan, and Job Briefs and Qualifications, as well as some financial restitution for employees.

On December 28, 1972, attorneys for AT & T and EEOC, the Division of Fair Labor Standards and the OFCC had reached tentative accord on the substantive provisions of a settlement agreement. Shortly thereafter, copies of the tentative agreement were transmitted to both the IBEW and the CWA, the two labor organizations which might be most affected by any final agreement reached in this matter.

On January 9 and 10, 1973, the Solicitor of Labor, Richard F. Schubert, conversed with Hackler of the CWA during which Hackler revealed that he was aware of the status of the Government negotiations with AT & T and further that the CWA wished no active involvement with any Government agency. He reiterated that CWA wished to negotiate

exclusively with AT & T the development of any Affirmative Action Program.

On January 11, 1973, Messrs. Hackler and Schubert again spoke concerning the AT & T agreement, at which time Mr. Hackler had in his possession a copy of the tentative agreement previously referred to above and was encouraged by Mr. Schubert to make his views on this matter known to the Government prior to the execution of any final agreement between AT & T and the Government. Hackler re-articulated his position that the CWA wanted to take no action until after the Government had concluded its negotiations with AT & T. Hackler, nonetheless, did consent to inquire of the CWA Executive Board, scheduled to meet on January 12, 1973, if they might re-evaluate their policy of non-involvement.

On January 12, 1973, Messrs. Hackler and Schubert again conversed and a meeting between them and representatives of their offices was scheduled for January 15, 1973, for the purpose of allowing the CWA to express its specific concerns as to the impact the tentative agreement would have on bargaining agreements between the CWA and AT & T operating companies.

On January 15, 1973, Kilberg and other representatives of the Solicitor's Office met with Mr. Hackler and other representatives of the CWA to review the terms of the draft agreement and specifically to respond to the views of the CWA regarding the agreements maintained between it and AT & T operating companies. In a letter dated January 16, 1973, to Schubert, Hackler summarized the contents of their discussions of the preceding day and remarked, "to restate our [CWA's] position, it is our intent to serve notice on the Bell System demanding immediate negotiations on the items referred to above, all of which have a direct bearing on contract provisions now in effect. We propose in addition that the pending agreement between your good offices and the AT & T Company be held in abeyance until such negotiations have been concluded." [18] On January 16, 1973, Hackler also wrote Rex R. Reed of AT & T, as has already been noted, requesting negotiations between AT & T and CWA.

On January 18, 1973, the action now pending before me was instituted by the lodging of a fifteen page complaint against AT & T, charging it with violating Sections 6(d) [19] and 15(a)(2) [20] of the Fair Labor Standards Act of 1938, as amended, 29 U.S.C. § 201 et seq.; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, Pub.L. No. 92-261 (March 24, 1972); and Executive Order 11246, 30 Fed.Reg.

---

18. Letter of R. W. Hackler to Richard F. Schubert, Exhibit "A" of Affidavit of Richard W. Hackler, Doc. No. 9.

19. Section 6(d) of the Fair Labor Standards Act provides in relevant part:

"(1) No employer having employees subject to any provisions of this section shall discriminate, within any establishment in which such employees are employed, between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which he pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions, except where such payment is made pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex: Provided, That an employer who is paying a wage rate differential in violation of this subsection shall not, in order to comply with the provisions of this subsection, reduce the wage rate of any employee."

(This section will hereinafter be referred to as the Equal Pay Act of 1963.)

20. Section 15 [29 U.S.C. § 215] states in relevant part:

"(a) After the expiration of one hundred and twenty days from June 25, 1938, it shall be unlawful for any person—

\* \* \* \* \* \* \*

(2) to violate any of the provisions of section 206 or section 207 of this title, or any of the provisions of any regulation or order of the Administrator issued under section 214 of this title".

12319, as amended, 41 CFR Part 60–2. Contemporaneously therewith, the named defendants filed an answer to the complaint. After the docketing of the complaint and answer and following a Court hearing on the matter, a Consent Decree and accompanying Memorandum of Agreement were filed. In the provisions of the Consent Decree and Memorandum of Agreement, there was no admission by any of the named defendants or any finding by the Court of any violation of the federal statutes alluded to in the complaint.

Specifically, with regard to the preservation of any interest of the various collective bargaining agents, the Consent Decree emphasized at 22–23 that:

"D. This Decree shall not be interpreted as requiring the abandonment of any provisions in any Bell Company's collective bargaining agreement(s) except as required to maintain compliance with Federal law, Executive Orders and regulations promulgated pursuant thereto pertaining

to discrimination in employment. All of the Bell Companies' obligations in this Decree are required for compliance with Federal law; provided, however, *that nothing in this Decree is intended to restrict the right of the Bell Companies and the collective bargaining representatives of their employees to negotiate alternatives to the provisions of this Decree which would also be in compliance with Federal law.*

"To the extent that any Bell Company has in effect a posting and bidding system, this system shall continue to be used. Provided, however, that such system will be modified to the extent necessary to conform with PART A, Section III of this Decree.

"*Each Bell Company shall notify all appropriate collective bargaining representatives of the terms of this Decree and of its willingness to negotiate in good faith concerning these terms.*" [21] (Emphasis added.)

[21]. Throughout the Consent Decree exceptions and qualifications were additionally extended to the collective bargaining representatives so that whenever possible the contractual integrity of existing collective bargaining agreements was maintained.

For example, Section III of Part A of the Consent Decree, set forth below, illustrates the attempts to reconcile some conflicting elements of the collective bargaining agreements:

"III. TRANSFER, PROMOTION, LAYOFF AND RECALL.

"A. Each Bell Company shall offer each of its female and minority employees in non-management, non-craft jobs who had four or more years of net credited service on July 1, 1971, and who expresses a desire for transfer as required by the appropriate upgrading and transfer plan or posting and bidding system to a job in AAP job classification 9 or 10, an opportunity to compete therefor with other employees on the basis of net credited service and basic qualifications, as set forth in Appendix C, if females or minorities currently are underutilized in such AAP classification 9 or 10 and such employee is a member of the group which is underutilized. For purposes of this Decree, 'net credited service' shall mean total length of service with the operating company in which the vacancy occurs. Provided, how-

ever, that total length of service within the Bell System shall continue to be used for other purposes, including bridging rights, *consistent with the provisions of the applicable Bell Company's collective bargaining agreement(s).*

"Provided further, *each Bell Company and each collective bargaining representative of their employees shall be free to bargain to expand this definition of net credited service, for purposes of this Agreement, to mean total length of service with the Bell System.*\*

"*Where the term net credited service is presently defined in applicable collective bargaining agreements as length of service greater than that of the company into which the employee was last hired, definition of that term shall be unaffected by this paragraph.*

"B. In filling vacancies in AAP job classifications 6 and 7, candidates for promotion shall be evaluated on the basis of net credited service and best qualified, *unless a lower standard of qualification is provided in a collective bargaining agreement or pursuant to Bell Company practices.* However, if any Bell Company is unable to meet its intermediate targets within the stated time frames using these criteria, it will use only the criteria of net credited service and a basic qualified criterion and, if necessary, will seek new hires who meet at least the basic quali-

Thus it is in the factual context of all the aforementioned history that CWA's motion to intervene as a plaintiff must be examined. Similarly, it is against this setting that the Court approaches characterizations of CWA, as found in paragraph 4 of its motion:

"CWA, despite its status as collective bargaining representative for a preponderance of the employees of the defendants, was not invited and did not participate in the negotiations leading up to the said agreement and consent order, except for a brief conference with the Solicitor of Labor on January 15, 1973, and informal advices from the participants. . . ."

Given this background attention can now be directed to the legal questions.

### III.

### INTERVENTION UNDER RULE 24(a)(1)

A. *Rule 24(a)(1) and Section 17 of the Fair Labor Standards Act.*

Arguments propounded by CWA as to intervention under Rule 24(a)(1) will be treated seriatim so that the Court can precisely ascertain which specific statute(s) purportedly conferred upon CWA

an *unconditional* right to intervene as a plaintiff in the instant action. Since there were lodged in the complaint allegations of violations by the defendants of the Fair Labor Standards Act of 1938, viz., the Equal Pay Act of 1963; Title VII of the 1964 Civil Rights Act; and Executive Order 11246, theoretically several statutory enactments could have explicitly authorized the intervention now sought by CWA. Thus in that regard the Court first appraises which legislative promulgations unequivocally empower it to sanction a labor organization's unconditional intervention as a plaintiff in a suit commenced by the Secretary of Labor pursuant to Section 17 of the Fair Labor Standards Act, 29 U.S.C. § 217.

Under Section 16(b) of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 216(b), an employee in his own right can sue his employer for violating the provisions of Section 6 or Section 7 of FLSA, 29 U.S.C. §§ 206 and 207. As heretofore stated, in the case at bar, AT&T was alleged to have breached 29 U.S.C. § 206(d), the Equal Pay Act of 1963.[22] But the right of the employee to resort to legal action for enforcement of the Equal Pay Act of 1963 and for recovery of unpaid minimum wages is not

fied criterion. Efforts to achieve intermediate targets should be substantially uniform throughout the appropriate time frame. *Each Bell Company agrees to notify the appropriate collective bargaining representative of its employees prior to promoting or transferring persons into AAP job classifications 6 and 7 on the basis of net credited service and basic qualifications.*

"C. Net credited service shall be used for determining layoff and related force adjustments and recall to jobs where non-management female and minority employees would otherwise be laid off, affected or not recalled. *Collective bargaining agreements or Bell Company practices shall govern the confines of the group of employees being considered.* Provided, however, vacancies created by layoff and related force adjustments shall not be considered vacancies for purposes of transfer and promotion under this Section.

"D. Minimum residency (time in title) requirements shall not be greater than the following, in the major job titles noted below:

1. Clerical, six–twelve months time in title;
2. Operator, six–twelve months time in title;
3. Service Representative, fifteen–eighteen months time in title;
4. Lower and Middle Craft, fifteen–eighteen months time in title;
5. Top Craft (Switchman, PBX Installer, PBX Repairman, Toll Test man, etc.), twenty-four–thirty months time in title.

*"Collective bargaining agreements of company practices which provide lower minimum residency requirements than those outlined above shall continue in effect."* (Emphasis added.)

\* Employees returning from maternity leave do not have their service broken (absence in excess of 30 days will be deducted from net credited service).

22. See note 19, *supra*, for the text of Section 206(d)(1).

unconditional and absolute. There is the caveat that:

" . . . The right provided by this subsection to bring an action by or on behalf of any employee, and the right of any employee to become a party plaintiff to any such action, *shall terminate upon the filing of a complaint by the Secretary of Labor in an action under section 217* of this title in which restraint is sought of any further delay in the payment of unpaid minimum wages . . . owing to such employee under section 206 . . . of this title by an employer liable therefor under the provisions of this subsection." 29 U.S.C. § 216(b) (Emphasis added.)

Another legislative authority for Section 206 suits is Section 16(c) of FLSA, 29 U.S.C. § 216(c), whereunder the Secretary of Labor initiates the litigation on behalf of certain designated employees who ask for his assistance:

" . . . When a written request is filed by any employee with the Secretary of Labor claiming unpaid minimum wages or unpaid overtime compensation under Section 206 or Section 207 of this title, the Secretary of Labor may bring an action in any court of competent jurisdiction to recover the amount of such claim . . .. The consent of any employee to the bringing of any such action by the Secretary of Labor, unless such action is dismissed without prejudice on motion of the Secretary of Labor, shall constitute a waiver by such employee of any right of action he may have under subsection (b) of this section for such unpaid minimum wages or unpaid overtime compensation and an additional equal amount as liquidated damages. . . . "

The suit now pending before the Court was brought by the Secretary of Labor under Section 17 of FLSA, 29 U.S.C. § 217, a third jurisdictional basis for vindicating rights created by Section 206. The statute provides in relevant part:

"The district courts . . . shall have jurisdiction, for cause shown, to restrain violations of section 215 of this title, including in the case of violations of section 215(a)(2) of this title the restraint of any withholding of payment of minimum wages or overtime compensation found by the court to be due to employees under this chapter . . .."

Section 11(a) of FLSA, 29 U.S.C. § 211(a), requires that the Secretary of Labor institute all actions under Section 17 to restrain violations of the Act, except as provided in Section 12, 29 U.S.C. § 212, the subsection pertaining to child labor.

 The legislative history of FLSA reinforces and is congruent with the unambiguous language of the foregoing statutory provisions, which explicitly authorize only employees and the Secretary of Labor to commence legal actions. Furthermore, another restriction under Section 16(b) is that today a labor organization, acting through a union official, is not permitted to bring a representative action on behalf of all the union members and employees for recovery of back wages. This procedure, which was frequently utilized by a union to circumvent the statute since the union could not sue in its own name, was expressly invalidated by Section 5 of the Portal-to-Portal Act of 1947, Act of May 14, 1947, ch. 52, § 5, 61 Stat. 84.[23] Thus it is well settled and beyond any doubt that a labor organization lacks

---

23. Section 5 of the Portal-to-Portal Act of 1947 provided in relevant part:
 Representative Actions Banned.—
 "(a) The second sentence of section 16(b) of the Fair Labor Standards Act of 1938, as amended, is amended to read as follows:
 'Action to recover such liability may be maintained in any court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.' "

standing to enforce the Section 206 rights of its members in a private action prior to the filing of any suit by the Secretary of Labor under Section 17 of FLSA.

A reading of FLSA Sections 16(b), (c) and 17, as well as an examination of the legislative history and applicable decisional law, illustrates the varying remedial measures Congress framed for implementation and furtherance of its declared policies.[24] Under Section 16(b), presumably in order to encourage the bringing of suits by employees and thus obviating and minimizing the litigation expenses of the Secretary of Labor, the statute allows successful employees to be awarded liquidated damages in an amount equal to the unpaid minimum wages. Hodgson v. Wheaton Glass Co., 446 F.2d 527, 534–535 (3rd Cir. 1971). Similarly, Section 16(b) permits recovery of reasonable attorney's fees and court costs.

■■ On the other hand, the relief available under Section 16(c) is more limited and restricted. There is no comparable provision for awarding liquidated damages. The most liberal form of relief, however, is found in Section 17, whereunder the Secretary of Labor, without being dependent upon the submissions of written requests by affected employees as in Section 16(c), can come into court as the guardian of the public interest to restrain the present and future violations of FLSA by the employ-

er. In addition thereto, he is empowered to collect back wages owed to employees. Hodgson v. Wheaton Glass Co., 446 F.2d 527, 529–532 (3rd Cir. 1971). To avoid a multiplicity of litigation by employees for essentially the same violations, once the Secretary of Labor files a suit under Section 17 any private right of action of employees under Section 16(b) is terminated and abolished. CWA nonetheless asserts that even though as a labor organization it was barred initially from instituting a suit under Section 16(b) and notwithstanding the termination of employees' rights after a Section 17 action by the Secretary of Labor, it has an unconditional right to intervene as a plaintiff. The legislative history and cases are silent on this particular point. I find that absent some independent jurisdictional basis for this request, CWA's motion to intervene unconditionally as a plaintiff in a Section 17 suit by the Secretary of Labor must be denied.

■ Several sources support the result which I have reached. First, only the Secretary of Labor is vested with the exclusive authority for filing a suit under Section 17 to restrain FLSA violations. Durkin v. Pet Milk Co., 14 F. R.D. 374, 379 (W.D.Ark.1953); Bowe v. Judson C. Burns, 137 F.2d 37, 39 (3d Cir. 1943); Powell v. Washington Post Co., 105 U.S.App.D.C. 374, 267 F.2d 651 (1959) (per curiam), cert. denied, 360 U.S. 930, 79 S.Ct. 1449, 3 L.Ed.2d 1544

24. For cases which extensively analyzed the legislative history of these provisions, see Wirtz v. Jones, 340 F.2d 901 (5th Cir. 1965); Shultz v. Wheaton Glass Co., 319 F.Supp. 229 (D.N.J.1970), aff'd. sub nom., Hodgson v. Wheaton Glass Co., 446 F.2d 527 (3rd Cir. 1971); Hodgson v. American Can Co., 440 F.2d 916 (8th Cir. 1971).

The Congressional findings and declaration of policy are embodied in 29 U.S.C. § 202:

"(a) The Congress finds that the existence, in industries engaged in commerce or in the production of goods for commerce, of labor conditions detrimental to the maintenance of the minimum standard of living necessary for health, efficiency, and general well-being of workers (1) causes commerce and the channels and instrumentalities of

commerce to be used to spread and perpetuate such labor conditions among the workers of the several States; (2) burdens commerce and the free flow of goods in commerce; (3) constitutes an unfair method of competition in commerce; (4) leads to labor disputes burdening and obstructing commerce and the free flow of goods in commerce; and (5) interferes with the orderly and fair marketing of goods in commerce.

"(b) It is declared to be the policy of this chapter, through the exercise by Congress of its power to regulate commerce among the several States and with foreign nations, to correct and as rapidly as practicable to eliminate the conditions above referred to in such industries without substantially curtailing employment or earning power."

(1959); Roberg v. Henry Phipps Estate, 156 F.2d 958, 963 (2d Cir. 1946); and Britton v. Grace Line, Inc., 214 F. Supp. 295 (S.D.N.Y.1962). *Cf.* Mitchell v. Singstad, 23 F.R.D. 62 (D.Md.1959). Second, Section 11(a) of FLSA, as has hereinabove been alluded to, authorizes and obligates the Secretary of Labor to commence all restraining actions under Section 17, excluding Section 12 proceedings. CWA cannot, by way of a motion for intervention, arrogate to itself power delegated by Congress solely to the Secretary of Labor.

Third, the relief obtainable under Section 17, as distinguished from that allowable under Sections 16(b) or (c), is derived from equity and is not limited to restitutory sustenance. Rather an action under Section 17 is one for the vindication of the public interest. As has been described by one court:

> "The history and purpose of the Fair Labor Standards Act and of § 17, both in its wording and in its relationship to the other sections of the Act, make it abundantly clear that § 17 was designed and enacted as a necessary measure to assure the effective and uniform compliance with and adherence to a public policy, relating to wage standards for labor, adopted in the National interest." Wirtz v. Jones, 340 F.2d 901, 903 (5th Cir. 1965).

> \* \* \* \* \* \*

> " . . . [T]he purpose of the injunction to restrain the withholding of wages due is not to collect a debt owed by an employer to his employee *but to correct a continuing offense against the public interest.* It is true that as a result, money may pass from the employer into the pocket of the employee or, if he is not available, then into the coffers of the United States Treasury, but that enforced payment, which must be made even if the employee or his representatives or heirs no longer exist to claim it, is simply a part of a reasonable and effective means which Congress, after trial and error, found it necessary to adopt to bring about general compli-

ance with § 15(a)(2). In the course of his remarks in presenting the bill for the 1961 amendment to the Act, President Kennedy, then Senator, said, with reference to the enforcement provisions, ' . . . it will serve as a source of protection to employers who pay a decent wage and who must compete with employers who pay a substandard wage.' " *Id.* at 904–905. (emphasis added.)

See, also Shultz v. Wheaton Glass Co., 319 F.Supp. 229, 232 (D.N.J.1970), and Schultz v. Ber Lue Originals Inc., 62 CCH Lab.Cas. ¶32,301 at 44,145 (S.D. Fla.1970).

This review of the applicable legal rulings and legislative history persuades me that the components of the comprehensive statutory enforcement scheme of FLSA should not lightly be discarded or ignored absent more definitive guidance and direction from the legislative body promulgating them. The Congressional framers felt compelled to deputize only the Secretary of Labor for ultimately determining when there should be an invocation of equitable relief in championing and safeguarding the public interest. Thus, insofar as CWA's motion to intervene as a plaintiff in this over-all action is bottomed upon the standing and power reposing solely in the Secretary of Labor pursuant to 29 U.S.C. § 217, its motion is denied.

**B.** *Rule 24(a)(1) and Executive Order 11246.*

The second series of charges levelled against AT&T in the complaint arise out of its alleged failure to comply with Executive Order 11246, as amended.

As the sole statutory basis for intervention under Rule 24(a)(1) in a suit commenced by the Attorney General of the United States to effectuate the Executive Order, CWA cites the recent amendments of the Office of Federal Contract Compliance, 37 Fed.Reg. 20536 (1972). More specifically, CWA argues:

> "Under the action by the Attorney General pursuant to Executive Order No. 11246, CWA would have been per-

mitted to intervene in the hearings provided for in the Office of Federal Contract Compliance (OFCC) according to the regulations promulgated September 30, 1972, 37 F.R. 20536. In the applicable section 60–30.11(a)(1) it states:

'To the extent that proceedings hereunder involve employment of persons covered by a collective bargaining agreement, and compliance may necessitate a revision of such agreement, any labor organization which is a signatory to the agreement shall have a right to participate as a party.'

"If CWA would have a right to participate in the hearing before the OFCC to revise the agreement to comply with the Federal Executive Order, there can be no question that at the level of a Consent Decree that right is equally strong. Accordingly, there is a right created by Executive Order and implemented by regulation which creates a legally recognized right pursuant to Executive Order. Since the allegations in Count Three pursuant to the Executive Order are identical with those alleged by the EEOC in Count 2, the interests being protected are the same and should form the basis for CWA's right to intervene even under the Executive Order jurisdiction."

Memorandum in Support of Motion of Communications Workers of America for Leave to Intervene, Doc. No. 8 at 16–17.

▮ Quite candidly, I am neither impressed nor persuaded by this line of argument. It does not necessarily follow that because one has the right to be a participating party in an administrative hearing, that right can be so extended and enlarged to warrant an *unconditional* intervention in any lawsuit brought by the Attorney General in aid

of implementation of the Executive Order. Unfortunately, or otherwise, a person or organization does not have a legal right to bring a private civil action in order to enforce or challenge the degree of a contractor's compliance with the antidiscrimination provisions of the Executive Order. Farkas v. Texas Instrument, Inc., 375 F.2d 629, 632–633 (5th Cir. 1967); Farmer v. Philadelphia Electric Co., 329 F.2d 3, 9 (3rd Cir. 1964). Moreover, the facts of the case at bar reveal that although there never was any formal hearing conducted by OFCC to filter employment discrimination complaints against AT & T, CWA on several occasions between September 1972 and January 1973 failed to avail itself of numerous opportunities to participate in informal compliance sessions with OFCC, as was done by IBEW. In fact the GSA approval of September 20, 1972 was set aside so that affected labor organizations would be afforded the opportunity to air their views on the revisions of their respective collective bargaining agreements.

▮ Absent more explicit jurisdictional authority, I find that the administrative regulations as promulgated at 37 Fed.Reg. 20536 (1972) do not· fulfill, and fall short of, the requirements enunciated in Rule 24(a)(1). Thus the Court accordingly must deny that portion of CWA's motion which asserts CWA has a statutorily conferred right to intervene unconditionally in a suit commenced by the Attorney General of the United States.

C. *Rule 24(a)(1) and Title VII.*

While the other grounds relied on by CWA for intervention seemed totally without merit, CWA presents a closer issue for adjudication when it claims that under 42 U.S.C.A. § 2000e–5(f)(1) it has a right to intervene in a suit brought by EEOC pursuant to the new enforcement powers of the Equal Employment Opportunity Act of 1972.[25]

---

25. Granting EEOC the right to initiate litigation was viewed by Congress as an effective means of reinvigorating the agency and providing it with the clout essential to

In many respects this is a case of first impression, since the 1972 amendments have not yet been adjudicated as to the meaning of "person or persons aggrieved" in light of the Commission's new enforcement powers. At any rate the statutory process requires as a starting point that some charge must be filed with the Commission. The first sentence says "If within thirty days after a charge is filed. . . ." [26]

Thus, the statutory language which speaks of the "person or persons aggrieved" encompasses the concept of an original charge having been first filed with the EEOC. The statutory construction problems require a recognition of at least three different levels of factual nexus which should be delineated when determining whether one has (or has not) the right to intervene as a "person aggrieved":

(1) Where the issues before the Federal Court in the instant suit initiated by the EEOC are *totally different* than the charge originally filed by the party before EEOC, should the party have the right to intervene in the Federal Court action?

(2) If the issues before the Federal Court in the suit initiated by EEOC are *substantially broader* and only *minisculely related* to the charge the party originally filed before EEOC, should the party have the right to intervene in the Federal Court action as to all of the oth-

---

mount the broad-scale, balanced assault needed against employment discrimination. See H.R.Rep.No.92–238, 92nd Cong., 2d Sess. (1972), U.S.Code Cong. & Admin. News, Vol. 2 at pp. 2137–2179 (1972).

26. Section 706(f)(1) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–5(f)(1), as amended, Pub.L.No.92–261, § 4(a) (March 24, 1972) states as follows:

"If within thirty days after a charge is filed with the Commission or within thirty days after expiration of any period of reference under subsection (c) or (d) of this section, the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission may bring a civil action against any respondent not a government, governmental agency, or political subdivision named in the charge. In the case of a respondent which is a government, governmental agency, or political subdivision, if the Commission has been unable to secure from the respondent a conciliation agreement acceptable to the Commission, the Commission shall take no further action and shall refer the case to the Attorney General who may bring a civil action against such respondent in the appropriate United States district court. *The person or persons aggrieved shall have the right to intervene in a civil action brought by the Commission or the Attorney General in a case involving a government, governmental agency, or political subdivision.* If a charge filed with the Commission pursuant to subsection (b) of this section is dismissed by the Commission, or if within one hundred and eighty days from the filing of such charge or the expiration of any period of refer-

ence under subsection (c) or (d) of this section, whichever is later, the Commission has not filed a civil action under this section or the Attorney General has not filed a civil action in a case involving a government, governmental agency, or political subdivision, or the Commission has not entered into a conciliation agreement to which the person aggrieved is a party, the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, shall so notify the person aggrieved and within ninety days after the giving of such notice a civil action may be brought against the respondent named in the charge (A) by the person claiming to be aggrieved or (B) if such charge was filed by a member of the Commission, by any person whom the charge alleges was aggrieved by the alleged unlawful employment practice. Upon application by the complainant and in such circumstances as the court may deem just, the court may appoint an attorney for such complainant and may authorize the commencement of the action without the payment of fees, costs, or security. Upon timely application, the court may, in its discretion, permit the Commission, or the Attorney General in a case involving a government, governmental agency, or political subdivision, to intervene in such civil action upon certification that the case is of general public importance. Upon request, the court may, in its discretion, stay further proceedings for not more than sixty days pending the termination of State or local proceedings described in subsections (c) or (d) of this section or further efforts of the Commission to obtain voluntary compliance." (Emphasis added.)

er issues which were not related to the party's original charge before EEOC?

(3) If the issues before the Federal Court are the *same* in scope, or substantially the same in scope, as those which the party filed before EEOC, should the party have the right to intervene in the EEOC's action in the Federal Court?

■ If the record constituted the third factual situation, *supra,* clearly CWA would have the right to intervene as a "person aggrieved." As I read the record, the evidence preponderantly supports the conclusion that the EEOC's complaint is *totally* different than the CWA's original charge before EEOC. Yet if one stretches every inference in the record in the light most advantageous to CWA, one could perhaps conclude that *on one issue only* there is a *miniscule,* tangential relationship between the charge CWA filed before EEOC, and one of the issues in the EEOC's Consent Decree. Thus, of the three categories noted above, CWA's position is probably that of (1) only, but conceivably it could be stretched to fall within the ambit of (2).

At some point, before one may be considered to be a "person aggrieved" presumably there must be some nexus between the person's original charge before EEOC and the charge which EEOC makes in the complaint in the District Court. If no substantial nexus is needed between the charges filed before EEOC and EEOC's charges in the complaint in the U. S. District Court, then Section 706(f)(1) means that a complaint as to any one condition of employment grants a party the right to intervene on any other charge in a District Court suit, even when the other charges in the District Court are not related to the original charges filed before EEOC.

The facts of this case demonstrate how expansive a reading of "person aggrieved" CWA's rationale contemplates. As previously noted, the Consent Decree and complaint in the instant case before this court cover a broad range of issues. The Decree goes to the heart of the sys-

tem—money, goals, timetables, affirmative action programs, compliance monitoring, pay adjustments, new transfers and promotion opportunities. Conservative estimates of the settlement are projected ultimately to cost AT & T $38,000,000; $15,000,000 being allocated as back wages to the victims of AT & T's purported discriminatory employment practices and the remaining $23,000,000 to be expended for additional benefits created by the Decree. When viewed with this broad range of issues covered by the instant complaint and Consent Decree, what was the magnitude of charges which CWA raised before EEOC at any time for any of the employees who could be affected by this decree? *CWA had taken no action before the EEOC touching upon any of these broad range issues.* Without exception the only matter on which it has ever filed complaints before EEOC relates solely to AT&T's policies pertaining to maternity leave. Typical of the standard form language found in each of the charges is:

> "Respondents' policies and practices involving matters such as commencement and duration of leave, the availability of extensions, the accrual of seniority and other benefits and privileges, reinstatement, and payment under any health or temporary disability insurance or sick leave plan are not applied to disability due, to pregnancy, or childbirth, on the same terms and conditions as they are applied to other temporary disabilities."

With the galaxy of rights assured in the Consent Decree, the CWA's sole and sporadic efforts on behalf of pregnant women seem miniscule in contrast to the magnitude of rights now assured under the consent order.

Furthermore, none of the CWA charges before EEOC are included and incorporated in the complaint at bar. Thus any ruling by the Court now will not necessarily impair CWA's ability to process administratively its charges before EEOC. Moreover, if there is a failure to secure voluntary compliance

by the agency, a ruling now adverse to CWA will not in any way be dispositive of its rights to enforce and prosecute those charges by resort to private litigation. On the basis of a negative decision today, CWA would not *per se* be barred or precluded from initiating its own lawsuit challenging AT&T's maternity leave practices.

A single footnote on page 7 of the Consent Decree provides as follows:

"Employees returning from maternity leave do not have their service broken (absence in excess of thirty days will be deducted from net credited service)."[27]

But for that footnote there could be not even a tangential relationship between anything in the Consent Decree and the charges that CWA has filed before EEOC. I recognize that in the pre-amendment cases the courts have taken a broad reading of "persons aggrieved," thereby maximizing the options of litigation in federal courts. *Cf., e. g.,* International Chemical Workers U. v. Planters Mfg. Co., 259 F.Supp. 365 (N.D.Miss.1966); Local 186, Int. Pulp, Sulphite & P.M.W. v. Minnesota M. & M. Co., 304 F.Supp. 1284 (N.D.Ind. 1969); Rogers v. Equal Employment Opportunity Commission, 454 F.2d 234 (5th Cir. 1971). Yet the case law demonstrates that when there is a clash between the requirements of the civil rights statutes and a union's preference as the collective bargaining agent, the union does not have any automatic right to litigate that issue and thereby undercut the impact of a civil rights settlement.

In Savannah Print. Spec. & P.P. Loc. U. 604 v. Union Camp Corp., 350 F. Supp. 632 (S.D.Ga.1972), the labor union sought an order under the Labor Managements Relations Act of 1947, as amended, 29 U.S.C. § 141 et seq., compelling an employer to arbitrate disputes concerning seniority layoffs. The changes in the seniority system had been required by the Office of Federal Contracts Compliance acting pursuant to Executive Order 11246 and additionally "were necessary under Title VII." *Id.* at 637. Although the changes instituted were unilaterally imposed, the Court found there was no basis for compelling arbitration under the facts of that case in order to challenge these modifications.

The definitive parameters of the right to intervene in cases of this type have not been spelled out in other cases. Thus, I approach this ruling with caution, recognizing that time and experience might provide more insights as to where the line should be drawn. However, if there must be some nexus between the charges filed before EEOC and the lawsuit in which the party seeks to intervene, by definition CWA's intervention has only a nexus with its prior charges alleging a disparity of benefits between pregnant female employees at AT&T and persons with other temporary disabilities.

CWA is granted leave to intervene in this action as a "person aggrieved" with its intervention restricted to the scope of the charges it has earlier instituted with EEOC. In the context of the Consent Decree, CWA can intervene on the dimensions of that footnote which reads:

"Employees returning from maternity leave do not have their service broken (absence in excess of 30 days will be deducted from net credited service)."

---

27. See note 21, *supra,* which contains in full the provisions from which the foregoing sentence was extracted.

In the Corpus Affidavit, Doc. No. 12 at 8–9, the following explanation is assigned for this footnote:

"The Consent Order in this case, as it relates to maternity leave policies of the Bell System, requires only one company, Northwestern Bell, to take action inconsistent with a collective bargaining agreement of CWA. Prior to the Consent Order, a female on maternity leave from Northwestern Bell accumulated no seniority while on leave. The Consent Order simply requires Northwestern Bell to give credit, for seniority purposes, for the first thirty days of maternity leave."

CWA, however, cannot in this motion for intervention as a matter of right enlarge upon or broaden the scope of the charges it already has before EEOC.

The corridors of future litigation on this issue of the right to intervene cannot be fully envisioned. We are not "at this point in time and in the development of law in this area" [28] able to delineate fully the parameters of this statute, nor would it be prudent for the Court even to undertake such a task now.

Thus, particularly for this case, my holding must be limited to the unique facts of the instant litigation history. Here, the CWA was requested time and time again to participate in the negotiations which led up to the settlement and Consent Decree. Each time CWA's response was a defiant rejection of participation. Unlike the International Brotherhood of Electrical Workers, CWA stayed aloof.

█ Thus, for all the foregoing reasons, CWA's motion for intervention under 42 U.S.C.A. 2000e–5(f)(1) is granted in part, with the extent of its participation subject to the aforementioned restrictions.

## IV.

### INTERVENTION UNDER RULE 24(a)(2).

CWA's next legal assertion is premised on intervening under Rule 24(a)(2), arguing essentially that its ability to protect its interest has been impeded and that interest was not adequately represented by existing parties.

CWA places undue reliance upon the recent Supreme Court decision of Trbovich v. United Mine Workers of America, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972). *Trbovich* involved a suit instituted by the Secretary of Labor pursuant to Title IV of the Labor-Management Reporting and Disclosure Act of 1959 (LMRDA), 29 U.S.C. § 481 et seq., to set aside an election of union officers because of violations of the Act. LMRDA required that a suit by the Secretary of Labor be the "exclusive" post-election remedy for challenging violations of Title IV and the Act barred union members from initiating a private action to enforce this Title. The Supreme Court nonetheless ruled that under Rule 24(a)(2) the union member who filed the initial complaint with the Secretary of Labor would not be precluded from intervention in the Secretary's suit, provided that the intervention be limited to the claims of illegality raised by the Secretary's complaint. Mr. Justice Marshall traced the history of the Act and concluded:

"The statute plainly imposes on the Secretary the duty to serve two distinct interests, which are related, but not identical. First, the statute gives the individual union members certain rights against their union, and 'the Secretary of Labor in effect becomes the union member's lawyer' for purposes of enforcing those rights. 104 Cong. Rec. 10947 (remarks of Sen. Kennedy). And second, the Secretary has an obligation to protect the 'vital public interest in assuring free and democratic union elections that transcends the narrower interest of the complaining union member.' Wirtz v. Local 153, Glass Bottle Blowers Ass'n., 389 U.S. 463, 475, 88 S.Ct. 643, 650, 19 L.Ed.2d 705 (1968). Both functions are important, and they may not always dictate precisely the same approach to the conduct of the litigation. Even if the Secretary is performing his duties, broadly conceived, as well as can be expected, the union member may have a valid complaint about the performance of 'his lawyer.' Such a complaint, filed by the member who initiated the entire enforcement proceeding, should be regarded as sufficient to warrant relief in the form of intervention under Rule 24(a)(2)."

---

28. International Chemical Workers U. v. Planters Mfg. Co., 259 F.Supp. 365, 368 (N.D.Miss. 1966).

404 U.S. at 538–539, 92 S.Ct. at 636–637.

While the legislative history of Title IV may have suggested cogent reasons justifying limited intervention in a suit by the Secretary of Labor there, that same result is not necessarily dictated here.

 First, with regard to intervention in a suit commenced by the Secretary of Labor under Section 17 of FLSA, there exist no dual interests as were present in *Trbovich*. A Section 17 action, as heretofore noted, was brought to vindicate a public interest and to effect the elimination of unfair labor practices and conditions. Moreover, the approach under Section 17 complemented the coordinate methods existing under Sections 16(b) and (c). While Section 17 litigation would oust jurisdiction from all other persons, there is neither any further relief which could be obtained by the intervening parties (maybe with the exception of securing liquidated damages) nor any additional representation which could be provided. And certainly, the union cannot be contending it has the right to resist or oppose a court's compelling AT & T to comply with the Equal Pay Act. The rights secured and guaranteed to employees by 29 U.S.C. § 206(d) cannot be collectively bargained away. 29 U.S.C. § 206(d)(2); [29] Hodgson v. Sagner, Inc., 326 F.Supp. 371 (D.Md.1971), aff'd sub nom., Hodgson v. Baltimore Reg. Joint Bd., 462 F.2d 180 (4th Cir. 1972) (per curiam).

 Any party invoking intervention under Rule 24(a)(2) must demonstrate, among other things, that his ability to protect his interest will be impaired or impeded unless he is permitted to participate in the litigation. In view of the numerous precautions incorporated into the Consent Decree and Memorandum of Agreement, no prejudice whatsoever can be visited upon CWA.

The Consent Decree speaks in unequivocal terms:

"This Decree shall not be interpreted as requiring the abandonment of any provisions in any Bell Company's collective bargaining agreement(s) *except as required to maintain compliance with Federal law, Executive Orders and regulations* promulgated pursuant thereto pertaining to discrimination in employment. All of the Bell Companies' obligations in this Decree are required for compliance with Federal law; *provided, however, that nothing in this Decree is intended to restrict the right of the Bell Companies and the collective bargaining representatives of their employees to negotiate alternatives to the provisions of this Decree which would also be in compliance with Federal law.*

\* \* \* \* \* \* \*

"Each Bell Company *shall* notify all appropriate collective bargaining representatives of the terms of this Decree and of *its willingness to negotiate in good faith concerning these terms.*"

Part B, II. D. of Consent Decree at 22–23. (Emphasis added.)

Inasmuch as the Consent Decree mandates that all collective bargaining representatives are guaranteed the right to negotiate alternatives to this Decree which are in full compliance with the applicable federal statutes, it becomes incomprehensible as to what more CWA can rationally be demanding, unless it is insisting upon the right to be free to negotiate alternatives which are not legal or are not totally consonant with existing federal laws. While it will be conceded that labor organizations have substantial followers and thus can exert enormous pressure on recalcitrant em-

---

29. Section 6(d)(2) of FLSA states:

"No labor organization, or its agents, representing employees of an employer having employees subject to any provisions of this section shall cause or attempt to cause such an employer to discriminate against an employee in violation of paragraph (1) of this subsection."

ployers during negotiating sessions, exacting terms which are extremely favorable for its members, labor unions cannot bargain for something which is patently illegal and runs afoul of the law. *E. g.*, Hodgson v. Sagner Inc., *supra;* United States v. Sheet Metal Workers Int. Ass'n, Local Union 36, 416 F.2d 123 (8th Cir. 1969); Local 189, United Papermak. & Paperwork v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L. Ed.2d 100 (1970); Local Union No. 12, United Rubber, C., L. & P. Wkrs. v. N. L. R. B., 368 F.2d 12 (5th Cir. 1966); Rosen v. Public Service Electric and Gas Co., 477 F.2d 90 at 95 (3rd Cir. 1973). *Cf.* McGuire Shaft and Tunnel Corp. v. Local 1791, United Mine Workers, 475 F.2d 1209 (Em.App.1973), cert. denied 412 U.S. 949, 93 S.Ct. 3008, 37 L.Ed.2d 1009 (1973) (Douglas, J., dissenting) (union unable to strike to press demand for wage increases above the limits established by the Pay Board Reg. § 201.17 pursuant to the Economic Stabilization Act of 1970, as amended, Pub.L. No. 92–210 (Dec. 22, 1971)).

▮▮▮ The long-standing federal interest in maintaining and promoting aggressive collective bargaining as a means of achieving the eradication of unfair labor conditions must be measured against and reconciled with equally valid, countervailing federal objectives. One such competing federal policy which significance is as paramount as that of collective bargaining is embodied in legislation enacted to extirpate from society invidious, discriminatory employment practices and to accord to every person the equal opportunity to secure job positions commensurate with his or her abilities. In order to effectuate the goals and policies embraced in Title VII and Executive Order 11246, collective bargaining agreements are not sacrosanct and can and should be modified and revised, even if done unilaterally. There must be a cessation of employment practices which perpetuate the effects of past discrimination. *E. g.*, Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971); Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971); United States v. Bethlehem Steel Corp., 446 F.2d 652 (2d Cir. 1971); Savannah Print., Spec. & P.P. Loc. U. 604 v. Union Camp Corp., 350 F.Supp. 632 (S.D.Ga.1972).

▮▮▮ That there should be an accommodation of the various federal statutes has been recognized by courts in other contexts. *E. g.*, Boys Markets, Inc. v. Retail Clerk's Union Local 770, 398 U.S. 235, 249–251, 90 S.Ct. 1583, 1591–1593, 26 L.Ed.2d 199 (1970); Southern S. S. Co. v. National Labor Relations Board, 316 U.S. 31, 47, 62 S.Ct. 886, 894, 86 L.Ed. 1246 (1942); [30] United Packinghouse, Food & Allied Workers Int. U. v. National Labor Relations Board, 135 U.S.App.D.C. 111, 416 F.2d 1126, 1133–1138 (1969). Similarly, the National Labor Relations Board has adopted the position that where unilateral changes in collective bargaining agreements are essential to comply with federal laws, these revisions would not constitute unfair labor practices. Standard Candy Co., 147 NLRB 1070, 1073 (1964); Southern Transport, Inc., 145 NLRB 615, 617–618 (1963); Office of the General Counsel NLRB, Quarterly Report on Case Developments, Rep. No. R–1229 (1972).[31]

---

**30.** "It is sufficient for this case to observe that the Board has not been commissioned to effectuate the policies of the Labor Relations Act so single-mindedly that it may wholly ignore other and equally important Congressional objectives. Frequently the entire scope of Congressional purpose calls for careful accommodation of one statutory scheme to another, and it is not too much to demand of an administrative body that it undertake this accommodation without excessive emphasis upon its immediate task." 316 U.S. at 47, 62 S.Ct. at 894.

**31.** In finding that mid-term contract changes in order to comply with equal employment opportunity legislation after notification to the union would not give rise to an unfair labor charge, the General Counsel of NLRB commented:

" . . . [T]he change effected by the Employer was consistent with the views of

Not only does CWA have the express language of the Consent Decree bestowing upon it the opportunity to negotiate legally acceptable alternatives and imposing upon AT & T and its subsidiary companies the obligation to bargain in good faith, it can additionally enforce that right under the National Labor Relations Act, as amended, 29 U. S.C. § 151 et seq., should AT & T not engage in good faith bargaining. *E. g.*, H. K. Porter Co. v. N. L. R. B., 397 U.S. 99, 90 S.Ct. 821, 25 L.Ed.2d 146 (1970); N. L. R. B. v. Wooster Div. of Borg-Warner Corp., 356 U.S. 342, 78 S.Ct. 718, 2 L. Ed.2d 823 (1958).

Thus in light of all the foregoing circumstances, I find there is no question that CWA's ability to protect its interest has not been impeded or impaired and its motion, insofar as it is predicated on intervening under Rule 24(a)(2), is denied.

### V.

### RULE 24(a) AND TIMELINESS.

All the parties in this action have raised the objection that CWA's motion to intervene was not timely filed as is required by Rule 24(a), particularly since it comes after the entry of a consent decree concluding the litigation.

The Court's attention is directed to United States v. Blue Chip Stamp Co., 272 F.Supp. 432 (C.D.Cal.1967) where the court held that motions to intervene were untimely filed when presented after the entry of a consent decree in a complex antitrust action. In many ways the factual description there is strikingly similar to the case at bar, with one crucial distinction which I find to be controlling here.

In *Blue Chip,* the Court noted that:

a federal administrative agency having direct responsibility for this subject. The General Counsel was convinced that the obvious necessity revealed by these facts for accommodating the statutory schemes of the Civil Rights Act and the NLRA in this instance brought into play the principles of the Supreme Court's decision in

"Rules 24(a) and 24(b) specifically provide for intervention only upon 'timely application'. The present motions were neither served nor filed until after June 5, 1967, the date the consent decree was entered. Twyman's motion was filed June 19, 1967; Thrifty Shoppers' on July 12, 1967; and Raley's on July 14, 1967. The rule for intervening after entry of a final judgment is set forth in Barron & Holtzoff, Fed.Prac. & Proc. 2 ¶ 594:

'Intervention may be allowed after a final judgment or decree if it is necessary to preserve some right which cannot otherwise be protected, but such intervention will not be permitted unless a strong showing is made.'

"Petitioners have failed to make any showing at all as to any right which can only be protected by intervention. Furthermore, there is no showing that their applications are 'timely'." Id. at 435.

After the litigation was commenced in *Blue Chip,* intensive negotiations to settle the action were undertaken by the Government, defendants, and anyone who desired to participate, with these negotiations lasting approximately two years before the consent decree was entered. Here, without reiterating the lengthy history, the negotiations with AT&T extended over a comparable two year span, with everyone and anyone being afforded ample opportunity to partake in the proceedings.

Further, the interests which CWA has can be sufficiently protected without intervention. But the material distinction here is when the actual litigation began. In view of the unique

Southern Steamship v. N. L. R. B., 316 U.S. 31 [, 62 S.Ct. 886, 86 L.Ed. 1246]." Quarterly Report on Case Developments, Rep.No.R–1229 (1972) at 4.
*Cf.* Carpenters Local No. 22, 195 NLRB No. 5 (Jan. 28, 1972), 79 LRRM 1194 (1972); Western Addition Community Organization v. NLRB, 485 F.2d 917 (D.C.Cir. 1973).

circumstances where you have the complaint and answer filed approximately 3:00 P.M. on January 18, 1973, and the Consent Decree was approved at 5:25 P.M. on the same day, the CWA's motion will not be treated as untimely when it was filed on February 9, 1973.

## VI.

## CONCLUSION

Thus for all the aforementioned reasons, the Court finds that CWA's motion to intervene as a plaintiff in the instant action must be and is hereby denied, except for the limited participation granted pursuant to 42 U.S.C.A. 2000e–5(f)(1).