**Bradley DeBRASKA, et al., Plaintiffs,**

v.

**CITY OF MILWAUKEE, Defendant.**

No. 96–C–402.

United States District Court,
E.D. Wisconsin.

June 19, 1998.

Michael T. Leibig, Zwerdling, Paul, Leibig, Kahn, Thompson & Wolly, Fairfax, VA, Laurie A. Eggert, Eggert & Edmonds, Milwaukee, WI, for Plaintiffs.

Rudolph M. Konrad, Deputy City Attorney, Stuart S. Mukamal, Assistant City Attorney, Milwaukee, WI, for Defendant.

## DECISION AND ORDER

MYRON L. GORDON, District Judge.

Approximately fourteen hundred Milwaukee police officers and their union, the Milwaukee Police Association, IUPA, Local 21, AFL—CIO ["MPA"], have sued the City of Milwaukee ["the city"], alleging violations of the Fair Labor Standards Act ["FLSA"], 29 U.S.C. §§ 201–219.

Some of the plaintiffs' claims were resolved by stipulation and order in December, 1997. The parties agree that the remaining issues are the following: (1) whether the city has administered an unlawful compensatory time system; (2) whether the city has failed to credit officers for canine care and transportation time; (3) whether the city should pay police officers for their travel time between picking up a squad car and going to their assigned location; (4) whether the city unlawfully requires police officers who are on sick or injured leave to stay on "home confinement;" and (5) whether the city should pay police officers their off-duty appearances at pre-disciplinary meetings held on city premises.

Pending before the court are the defendant's motion to dismiss the MPA as a plaintiff, the defendant's motion to strike the plaintiff's proposed undisputed facts, the defendant's motion for partial summary judgment, and the plaintiffs' motion for partial summary judgment.

### Defendant's Motion to Dismiss the MPA

The city claims that the police officer's union does not have standing to sue the city under the FLSA; the plaintiffs respond that the collective bargaining agreement between the city and the MPA is central to several of the issues. The plaintiffs also allege that while the MPA cannot recover damages in this action, it, as a public sector union, is a necessary party for the full and fair litigation of this action.

The FLSA specifically sets forth who has a "right of action" for certain violations of the Act:

An action to recover ... may be maintained against any employer (including a public agency) in any Federal or State court of competent jurisdiction by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such

a party and such consent is filed in the court in which such action is brought.

29 U.S.C. § 216(b). This portion of the statute was amended by section 5 of the Portal–to–Portal Act of 1947, which was entitled "Representative Actions Banned." *See EEOC v. AT & T Co.*, 365 F.Supp. 1105, 1120 n. 23 (E.D.Pa.1973), *aff'd*, 506 F.2d 735 (3d Cir.1974); *see also Arrington v. National Broad. Co.*, 531 F.Supp. 498, 500–502 (D.D.C.1982) (describing, in great detail, the history of the 1947 Act). The FLSA had formerly allowed employees to designate a representative to maintain an action for them. *Arrington*, 531 F.Supp. at 501; *AT & T*, 365 F.Supp. at 1120.

Many courts have interpreted the legislative history of the Portal–to–Portal Act of 1947, and the explicit language of § 216(b), to preclude a union, as a representative of its members, from suing an employer under the FLSA. *See State of Nevada Employees' Ass'n v. Bryan*, 916 F.2d 1384, 1392 (9th Cir.1990) ("Although individual members of SNEA clearly have standing to bring this suit, the clear language and legislative history of § 16(b) indicate that SNEA itself cannot be a party in this action."); *OTR Drivers v. Frito–Lay, Inc.*, 160 F.R.D. 146, 149 (D.Kan.1995) ("An action must be maintained by an individual employee or several employees. Thus, for example, a union may not bring an action on behalf of member employees.") (citations omitted); *AFSCME v. Virginia*, 1995 WL 913191, at *4 (W.D.Va. July 10, 1995); *AFSCME v. Moore*, 1992 WL 118742, at *1 (W.D.Mo. Feb.10, 1992) ("Decisions by federal courts applying and interpreting § 216(b) support defendants' argument that any remedies provided by § 216(b) flow exclusively to employees."); *International Ass'n of Firefighters, Local 349 v. City of Rome*, 682 F.Supp. 522, 533–34 (N.D.Ga. 1988); *Arrington*, 531 F.Supp. at 501 ("[T]he purpose of the ban on representative actions was to prevent large group actions, with their vast allegations of liability, from being brought on behalf of employees who had no real involvement in, or knowledge of, the lawsuit."); *AT & T*, 365 F.Supp. at 1120–21 ("Thus it is well-settled and beyond any doubt that a labor organization lacks standing to enforce the Section 206 rights of its members in a private action. . . ."). *But see*

*International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 810 n. 22 (D.C.Cir.1983) (stating, in a FLSA case, that the defendants "do not, and could not reasonably, claim that the fact that manufacturers' associations and labor organizations are suing in a representative capacity presents additional complications in this case").

■ As mentioned above, the plaintiffs argue that the MPA is not suing in its *representative* capacity, but rather in its capacity as a party to the collective bargaining agreements at issue and as a party to a previous settlement agreement with the city. Both the collective bargaining agreements and the settlement agreement appear to be relevant; nevertheless, it does not change the fact that the MPA itself can receive no relief from this action, as it readily admits. That the terms of its collective bargaining agreement with the city may be affected is not enough to grant the union a right to sue under the FLSA. After all, the union entered into the collective bargaining agreement as a representative to the union, and as shown above, unions are not allowed to sue under the FLSA as a representative of its members. The MPA seems to be making a distinction between its representative capacity and its individual capacity where no distinction actually exists.

The plaintiffs cite *Hopkins v. Montgomery County*, AW–94–3018 (D.Md. Mar. 29, 1995) (unpublished) for the proposition that when a collective bargaining agreement is at issue, the union is a necessary plaintiff. First, unpublished decisions, especially those from another circuit, have no precedential value. I only mention this case because the police officers rely so heavily on it. Second, in the *Hopkins* order, the court only joined the union "as a *non-aligned* party for the limited purposes of participating in settlement discussions and assuring that the Defendants are not subject to conflicting obligations as a result of this suit." *Id.* (emphasis added). The court also noted that it was the *defendants* who were seeking to add the union as a party. *Id.*

The police officers and MPA also argue that Congress' 1985 amendments to the FLSA enlarge the role of a public sector

union in FLSA litigation. One of these amendments affected a public employer's providing compensatory time, in lieu of overtime, one of the issues present in this case. This compensatory time structure is governed by 29 U.S.C. § 207(o)(2), which provides that a public agency may provide compensatory time only when it is pursuant to the provisions of a collective bargaining agreement or "any other agreement between the public agency and representatives of such employees" or when there is an individual agreement between the employer and employee. *See also Moreau v. Klevenhagen,* 508 U.S. 22, 23–25, 113 S.Ct. 1905, 123 L.Ed.2d 584 (1993) (describing this 1985 amendment to the FLSA).

I agree with the plaintiffs that this compensatory time provision increases the role of a union in a public employer's compliance with the FLSA. I do not agree, however, that this provision requires the union to be a party in the litigation. The MPA is not demanding that the city comply with the agreement. Indeed, the union's joint complaint with the police officers states that a provision of its agreement regarding of the granting of compensatory time does not comply with the FLSA. (Compl.¶ 15.) The MPA's status as a plaintiff therefore seems inconsistent. Moreover, when Congress amended the compensatory time provision regarding public sector employees, it did not amend the "right of action" section mentioned above.

The plaintiffs cite several cases for the proposition that courts routinely require participation of public sector unions in litigation. In most of these cases, however, the courts simply allowed, without discussion, the unions to proceed as plaintiffs, and it does not appear that the defendant objected to their participation. *See Atlanta Professional Firefighters Union, Local 134 v. City of Atlanta,* 920 F.2d 800 (11th Cir.1991); *International Ass'n of Fire Fighters, Local 2141 v. City of Alexandria,* 720 F.Supp. 1230 (E.D.Va.1989), *aff'd,* 912 F.2d 463 (4th Cir. 1990) (unpublished); *Service Employees Int'l Union, Local 102 v. County of San Diego,* 784 F.Supp. 1503 (S.D.Ca.1992), *rev'd on other grounds,* 35 F.3d 483 (9th Cir.1994), *superseded,* 60 F.3d 1346 (9th Cir.1994), *cert.*

*denied,* 516 U.S. 1072, 116 S.Ct. 774, 133 L.Ed.2d 726 (1996).

Indeed, the plaintiffs have only provided one case in which a court explicitly found that a public-sector union was an appropriate plaintiff. That court, though, engaged in very little discussion. Citing 29 U.S.C. § 207(o), the court noted that the union wanted to sue "to enforce its own rights" and that "given the language of § 207(o) itself, a union or representative would be a logical plaintiff to bring an action." *AFSCME v. Colorado,* 1994 WL 739417, at *1 (D.Colo. Aug.10, 1994). This one case does not persuade me that the court should allow MPA to be a plaintiff. First, the Colorado court relied on *Bryan,* the ninth circuit court of appeals case that held that the union *could not* be a party to the action. *See Bryan,* 916 F.2d 1384, 1392 (9th Cir.1990). Second, the plaintiffs do not explain exactly what rights of its own the MPA would be enforcing, and it is unclear how the union would be a "logical plaintiff."

Because the statute does not allow the union to sue in a representative capacity and because it is unclear what rights the union is seeking to protect, the defendant's motion to dismiss the MPA as a plaintiff will be granted.

### *Defendant's Motion to Strike Plaintiff' Proposed Findings of Fact and the Cross-Motions for Summary Judgment*

The city has also moved to strike most of the proposed findings of fact that the plaintiffs submitted in support of their motion for partial summary judgment. The defendant's motion to strike is based on the plaintiffs' alleged failure adequately to support their findings with sufficient evidence. Specifically, the city argues that the plaintiffs improperly relied on their own response to interrogatories to support their proposed facts. These answers to the interrogatories, the city argues, are inadmissible hearsay.

While I believe that there are problems with the plaintiffs proposed findings of fact, I do not believe that striking this material from the record is the better procedure. I believe that the court should either accept or reject the findings of fact based on the sup-

port that the plaintiffs have given for its proposed findings. As the plaintiffs note in their response brief, their findings are only *proposed;* it is up to the court to decide whether they should be accepted as undisputed.

A motion for summary judgment will be granted when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. Only disputes over facts that are outcome determinative under the applicable substantive law are considered to be material and will preclude the entry of summary judgment. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Patel v. Allstate Ins. Co.,* 105 F.3d 365, 370 (7th Cir.1997).

The standard summary judgment procedure is that a summary judgment movant identifies for the court, "with reference to the record and to the law," the portions of the record that show that no genuine issues of material fact exist. *See Logan v. Commercial Union Ins. Co.,* 96 F.3d 971, 979 (1996); *Major Mat Co. v. Monsanto Co.,* 969 F.2d 579, 582 (7th Cir.1992). Once the movant does this, the non-movant must produce evidence beyond the pleadings to show that there are indeed genuine issues of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Logan,* 96 F.3d at 979. In resolving the motion, the court must then view the record, and any reasonable inferences drawn therefrom, in the light most favorable to the non-moving party. *Griffin v. City of Milwaukee,* 74 F.3d 824, 826–27 (7th Cir.1996).

That procedure is somewhat less applicable when there are cross-motions for summary judgment, as there are here. In this situation, the burden of the production of evidence falls on both movants: "[E]ach movant has the burden of presenting evidence to support its motion that would allow the district court, if appropriate, to direct a verdict in its favor." *Barhold v. Rodriguez,* 863 F.2d 233, 236 (2d Cir.1988); *see also CSFM Corp. v. Elbert & McKee Co.,* 870 F.Supp. 819, 829 (N.D.Ill.1994). The court must also look at

which party bears the burden of proof at trial because the movant who does not bear that burden "need only point to the insufficiency of the plaintiff's evidence to shift the burden to the plaintiff to raise genuine issues of fact as to each claim by substantial evidence." *First Pac. Networks, Inc. v. Atlantic Mut. Ins. Co.,* 891 F.Supp. 510, 513 (N.D.Cal.1995). It is the police officers who would bear the burden of proof at trial in this case. *Imada v. City of Hercules,* 138 F.3d 1294, 1296 (9th Cir.1998).

I am unable to accept many of the plaintiffs' proposed findings of fact for the simple reason that they have not provided the court with the documents that they refer to. As the city notes, the plaintiffs' proposed facts repeatedly cite their own responses to interrogatories, to the defendant's responses to interrogatories, and to the defendant's response to the plaintiffs' request for admissions. My review of the record, though, shows that none of these items have been filed with the court. It is not enough simply to acknowledge that these documents exist; it is the plaintiffs' burden to submit this evidence to the court.

The plaintiffs, after the city filed its motion to strike, filed the affidavits of Bradley De-Braska, the president of the MPA, and Patrick Doyle, the secretary-treasurer of the MPA. Both of the affiants stated that they have reviewed the plaintiffs' proposed findings of fact and that all the assertions therein are true. These short affidavits, however, are not evidence that can support the proposed factual findings. If a mere assertion that the proposed findings are true, made by a person with some personal knowledge, were all that it took for a court to take a fact as true, the whole point of Rule 56 would be circumvented. The purpose of summary judgment is for the parties to point to *evidence* in the record to support a certain finding. While affidavits can certainly be evidence, the affidavits need to address *each* specific factual finding and explain how the affiant has personal knowledge about that proposed finding. When a party has the burden of presenting evidence, such evidence must be of a type admissible at trial. *Bombard v. Fort Wayne Newspapers, Inc.,* 92

F.3d 560, 562 (1996). What the plaintiffs have provided is not sufficient to enable the court to accept all of their proposed findings. Keeping that in mind, I will set forth the facts that are undisputed as I discuss each relevant issue.

### A. Res Judicata

The MPA is an unincorporated labor organization that has represented non-supervisory police officers employed by the city for purposes of collective bargaining. (Defendant's Proposed Findings of Fact "DPFF" ¶ 3; Plaintiffs' Comments on Defendant's Proposed Findings of Fact ["PC"], at p. 1.) The plaintiffs are police officers of the city; they have all signed consent forms that are entitled "Milwaukee Police Association Consent to Become a Party Plaintiff in a Civil Action Under the Fair Labor Standards Act." (DPFF ¶ 6.) The MPA and the city have executed successive collective bargaining agreements governing police officers' wages, hours, and conditions. (DPFF ¶ 4; PC, at p. 1.)

In 1988, the MPA and a large segment of its members have brought suit in this court against the city, alleging that the city police department violated the FLSA. (DPFF ¶¶ 8, 13; PC, at p. 2a.) The MPA used similar consent forms in the previous case. (DPFF ¶ 9.) The plaintiffs in the earlier suit filed three complaints; all three alleged that the police department had "denied plaintiffs' requests for compensatory time off under circumstances where the granting of the request would not unduly disrupt the operation" of the police department. (DPFF ¶ 11; PC, at p. 2a.)

This court referred the previous case to Special Master Ben L. Chernov, and after extensive mediation, the parties eventually entered into a settlement in 1990. (DPFF ¶¶ 13–14; PC, at p. 2a.) The settling parties filed several documents with the court, including a 14–page "Stipulation and Settlement Agreement" and 16–page "Plan of Implementation." (DPFF ¶ 14; Mukomal Aff. ¶¶ 9–11, Exs. 4, 5.) The stipulation contained a "Plaintiffs' Covenant As to Future Actions" that stated that the plaintiffs "shall not counsel any individual or entity ... to commence any action against the City of Milwaukee ... with respect to any of the matters set forth in the original, First Amended, or Second Amended Complaint." The covenant also stated that the plaintiffs agreed that they "shall not provide or finance legal counsel to any individual(s) or entity(ies) in conjunction with any such action." (DPFF ¶ 16; Mukomal Aff. ¶ 14, Ex. 4.)

The city's first argument is that, because of the settlement of the earlier case, the police officers are barred from bringing their claim regarding compensatory time off. The doctrine of res judicata prevents the same parties, or their privies, from relitigating issues that have already been resolved by a court with proper jurisdiction. *Mason Tenders Dist. Council v. Laborers' Int'l Union,* 884 F.Supp. 823, 837 (S.D.N.Y.1995). Res judicata relieves courts and parties from "the cost and vexation of multiple lawsuits," conserves the court's resources, prevents inconsistent decisions, and promotes parties' reliance on a court's adjudication. *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 66 L.Ed.2d 308 (1980). A court bars an action under res judicata when (1) there was a final judgment on the merits in the previous case; (2) there is an identity between the causes of action; and (3) there is an identity between the parties of the previous case and the parties of the present case. *Hindo v. University of Health Sciences/The Chicago Med. Sch.,* 65 F.3d 608, 614 (7th Cir.1995), *cert. denied,* 516 U.S. 1114, 116 S.Ct. 915, 133 L.Ed.2d 846 (1996); *Golden v. Barenborg,* 53 F.3d 866, 869 (7th Cir.1995).

The city argues that this court's dismissal of the previous action was a final judgment on the merits of the action; the police officers respond that a stipulated dismissal does not meet this res judicata requirement. I agree with the city for three reasons: (1) the court approved the earlier settlement; (2) the parties intended to foreclose any subsequent actions; and (3) the court dismissed the previous case on its merits and with prejudice.

Several courts have held that there is a final judgment on the merits when the court approves the settlement. *See Hoxworth v. Blinder,* 74 F.3d 205, 208 (10th Cir.1996) (stating that "[g]enerally, court-approved settlements receive the same res judicata effect

as litigated judgments"), *cert. denied,* —— U.S. ——, 117 S.Ct. 66, 136 L.Ed.2d 27 (1996); *In re Medomak Canning,* 922 F.2d 895, 900 (1st Cir.1990) (same); *cf. Lucille v. City of Chicago,* 31 F.3d 546, 548 (7th Cir. 1994) (holding that a court has ancillary jurisdiction to enforce its prior judgments only when "the judgment explicitly incorporates the settlement, or reserves authority to enforce the settlement").

I believe that this court approved the settlement of the previous case and that it explicitly incorporated the terms of the settlement into its dismissal order. As noted above, the parties to the previous case filed several settlement documents with the court. The stipulation and settlement agreement set forth, in great detail, the terms of the settlement between the police officers and the city. Part of that agreement required the parties to submit the agreement and the attached plan of implementation to the special master and to the court itself. The agreement also stated that "[t]his Settlement Agreement is tentative only and is subject to final approval by the respective principals of the signatories hereto *and of the Court.*" (Mukamal Aff., Ex. 4, ¶ 3.) The agreement further stated that the special master was requested to forward a certification to the court "for its consideration and/or execution of an Order acknowledging this Settlement Agreement and empowering the Special Master to take those measures necessary to implement its terms pursuant to the Plan pending final approval by the court." (Mukamal Aff., Ex. 4, ¶ 3.)

In an April 9, 1990 order, I explicitly approved the parties' agreement as "fair and reasonable," and in an October 15, 1990 order, I approved the special master's certification that the parties had complied with the plan of implementation and dismissed the action, "on its merits and with prejudice." (Mukamal Aft., Exs. 6B, 6C.)

The rationale behind requiring that the parties have a full and fair opportunity to litigate an issue applies here. The police officers and the city did not merely negotiate among themselves and enter into a private settlement, sending a simple stipulation and order for dismissal to the court. They instead engaged in mediation before the special master and sought the court's approval of

their terms of settlement and the court's implementation of those terms. That these terms were embodied in the court's orders is also important.

It has been held that a settlement bars a second action when there is a showing that the parties to the earlier case intended that the issue not be relitigated. In *Levinson v. United States,* the court of appeals for the seventh circuit noted the general rule that res judicata does not apply when the parties resolved the issues in a mere stipulation, but said that "[t]here is an exception to this general rule where the parties to a stipulation or consent judgment intended to foreclose an issue from future litigation." 969 F.2d 260, 264 (7th Cir.1992); *see In re Graham,* 973 F.2d 1089, 1097 (3d Cir.1992) (holding that the intent of the parties is relevant when determining the preclusive effect of a stipulation); *Greenberg v. Board of Governors of the Fed. Reserve Sys.,* 968 F.2d 164, 168 (2d Cir.1992)) (same).

I find that the city has met its burden of showing that the parties to the settlement intended that the settlement would preclude further litigation on the issues raised in the complaint. First, as described above, the settlement documents contained the plaintiffs' agreement that they would not counsel any individual or entity, including "police officers that may in the future become employed by the MPD" to start another FLSA action against the city "with respect to any of the matters set forth in the original, First Amended, or Second Amended Complaint" and their agreement that the plaintiffs "shall not provide or finance legal counsel … in conjunction with any such action." (Mukamal Aff., Ex. 4, 7.)

Second, the attorney who represented the city in the previous case and who represents them in this case, states in his affidavit that the parties to the previous case discussed the compensatory overtime issue while they were before the special master. During those discussions, the attorney states, the police officers agreed to withdraw that claim "as part and parcel of the settlement of the Former MPA FLSA Case, and in consideration of the remaining terms of settlement thereof." (Mukamal Aff. ¶ 12.) I believe that the cove-

**1028**

nant, along with the statement that the parties discussed withdrawing the compensatory overtime issue, show a clear intent that the plaintiffs would neither relitigate, nor encourage any one else to relitigate, any of the issues that they raised in that case.

I also cannot ignore the fact that I dismissed the previous action "on its merits and with prejudice." Several courts have noted that when a court dismisses an action, even one that was resolved by a settlement, "with prejudice," the doctrine of res judicata bars a subsequent action. The court of appeals for the first circuit recently said:

> When a dispute of law exists between parties to a case and they agree to a settlement of that dispute and entry of a judgment *with prejudice* based on that settlement, then the terms of that judgment in relation to that legal issue are subject to res judicata principles. A judgment that is entered *with prejudice* under the terms of a settlement, whether by stipulated dismissal, a consent judgment, or a confession of judgment, is not subject to collateral attack by a party or a person in privity, and it bars a second suit on the same claim or cause of action.

*Langton v. Hogan,* 71 F.3d 930, 935 (1st Cir.1995) (emphasis added); *see also In re Energy Cooperative, Inc.,* 814 F.2d 1226, 1234–35 (7th Cir.1987) ("The suit was dismissed 'with prejudice,' indicating that the order barred any subsequent suits on the same cause of action.").

Because of the court's involvement in the settlement, the showing of the parties' intent not to relitigate the issues, and the dismissal "with prejudice," I find that the judgment dismissing the previous police officer case against the city was a final judgment on the merits.

■ The city next argues that there is an identity between the compensatory overtime claim in the first case and the present compensatory overtime claim. There is an identity between two causes of action when the actions consist of a " 'single core of operative facts' which give rise to a remedy." *Golden v. Barenborg,* 53 F.3d 866, 869 (7th Cir.1995) (*quoting Herrmann v. Cencom Cable Assocs., Inc.,* 999 F.2d 223, 226 (7th Cir.1993)). The court of appeals for the seventh circuit has also said that "two claims are one for purposes of res judicata if they are based on the same, or nearly the same, factual allegations." *Herrmann,* 999 F.2d at 226.

The complaint in the 1988 case alleged that the police department had denied the plaintiffs' request for compensatory time off "under circumstances where the granting of the request would not unduly disrupt the operation" of the police department. (Mukamal Aff. ¶ 6.) The present compensatory overtime claim alleges that the city, by vesting approval of compensatory time off in the "middle management of the police department, improperly administers its time off system." (Compl.¶ 17.) As a result, the plaintiffs allege, they are "not allowed protected and open access to use of their compensatory time." (Compl.¶ 17.) The police officers argue that this system violates the rule that compensatory time shall be given to all "if the use of compensatory time does not unduly disrupt the operations of the public agency." *See* 29 U.S.C. § 207(*o*)(5)(B).

The plaintiffs do not argue, for good reason, that the underlying claim of the two allegations is different. Both claims clearly state that the city's administration of the compensatory time off system violates the statutory "unduly disrupt standard." The plaintiffs state in a brief that "[t]he only common fact between the officers' 1988 claims and these claims are [sic] that the City continues to violate the same FLSA provisions." (Pl.'s Opp. to Def.'s Mot. for Partial Summ. J., at p. 11.) The plaintiffs, in making this statement, admit the significance of the fact that the two claims appear to arise from the very same conduct: the city's alleged continuous violation of particular parts of the FLSA.

Instead, the police officers argue that because the present complaint encompasses only post–1992 violations of the statutory standard, the claims are not the same. The flaw in the police officers' argument is that the compensatory overtime claim is not a new claim; they are merely seeking to recover for the violations occurring after 1992. Claiming new damages on an old claim, however, is not enough to overcome the res judicata problem. The question is not

whether the city *continues* to violate a right that the plaintiff raised and dismissed in the earlier case. Rather, the question is whether the claim existed at the time of the filing of the earlier case: "Once a transaction has caused injury, all claims arising from that transaction must be brought in one suit or be lost." *Car Carriers, Inc. v. Ford Motor Co.,* 789 F.2d 589, 593 (7th Cir.1986); *see Meekins v. United Trans. Union,* 946 F.2d 1054, 1057 (4th Cir.1991) ("[R]es judicata does not bar claims that did not exist at the time of the prior litigation. The standard is objective and 'it is the existence of the present claim, not party awareness of it, that controls.'") (citation omitted) (*quoting Harnett v. Billman,* 800 F.2d 1308, 1313 (4th Cir. 1986)).

It would be contrary to the policies behind res judicata—preventing multiple lawsuits based on the same issue and preserving parties' interest in a court's adjudication—to find that an old claim can be revived just because it continues to exist. The parties to the previous case agreed to dismiss that claim; there is no suggestion that the city promised to abate the allegedly illegal conduct regarding its compensatory overtime structure. Because there is no dispute that the claim existed at the time of the 1988 case, I find that there is an identity between the compensatory overtime claims.

 The city's final res judicata argument is that there is an identity between the plaintiffs in the first case and the plaintiffs in the present case. For there to be such an identity, the two sets of plaintiffs must be in "privity," meaning that they are "'so closely aligned that they represent the same legal interest.'" *Kraushaar v. Flanigan,* 45 F.3d 1040, 1050 (7th Cir.1995) (quoting *Kunzelman v. Thompson,* 799 F.2d 1172, 1178 (7th Cir.1986)). There need not be, however, "strict identity" of the parties. *Kraushaar,* 45 F.3d at 1050. In a case interpreting Illinois res judicata law, which is very similar to the federal doctrine, the court of appeals for the seventh circuit said that "[a]dequate representation of the same legal interests necessarily entails the absence of conflicts of interest between the party in the prior action and that in the subsequent action." *Retired Chicago Police Ass'n v. City of Chicago,* 7 F.3d 584, 594 (7th Cir.1993).

I believe that there is a strong identity between the plaintiffs in the first case and the plaintiffs in the present case. The complaints in the previous case described the individual plaintiffs as law enforcement officers employed by the Milwaukee Police Department and as members in good standing of the MPA. (Mukamal Aff., Exs. 1, 2, 3.) The present complaint describes the individual plaintiffs in almost exactly the same way. (Compl.¶ 9.) While the MPA was a plaintiff in the first action and will no longer be a plaintiff in this action, Bradley DeBraska, the current president of the MPA, is a lead plaintiff in both cases. Indeed, the plaintiffs admit in their brief that almost half of the plaintiffs in this action were also plaintiffs in the previous action. (Pl.'s Opp. to Def.'s Mot. for Partial Summ. J., at p. 14.) Furthermore, I do not foresee a conflict, nor do the plaintiffs argue that there exists a conflict, between the interests of the earlier and the current set of plaintiffs.

That the individual plaintiffs in the two cases are both members of the same union is also relevant to the identity of the parties element. Courts have found that the doctrine of res judicata applies when members of a union sue on a claim already brought by their union on their behalf. *See Carver v. Nall,* 986 F.Supp. 1134, 1140 (C.D.Ill.1997); *International Union, UAW v. ACME Precision Products, Inc.,* 515 F.Supp. 537, 539–40 (E.D.Mich.1981); *see also Rafferty v. City of Youngstown,* 54 F.3d 278, 283 (6th Cir.1995) (finding that police officers were bound by a consent decree entered into by their union and that they were therefore barred by res judicata from bringing an action that addressed terms in the consent decree). The analogous proposition is that when members of a union bring a claim already brought by other members of the same union, and by the union itself, especially when almost half of the plaintiffs are the same, res judicata applies. That is the situation here.

Several courts in this circuit have also acknowledged the doctrine of "virtual representation." The court of appeals has noted that "'a person may be bound by a judgment even though not a party if one of the parties to the suit is so closely aligned with his

interests as to be his virtual representative.'" *People Who Care v. Rockford Bd. of Educ.,* 68 F.3d 172, 177 (7th Cir.1995) (*quoting In re L & S Indus., Inc.,* 989 F.2d 929, 933 (7th Cir.1993)). Some factors to consider when determining whether the prior set of plaintiffs "virtually represented" the current set of plaintiffs are whether the legal and factual issues are the same, whether the plaintiffs' legal interests are "congruent," and whether the current set of plaintiffs were adequately represented in the earlier litigation. *Tice v. American Airlines, Inc.,* 959 F.Supp. 928, 935 (N.D.Ill.1997).

As I found above, the underlying legal and factual issue—whether the city's compensatory overtime system violates the statutory "unduly disrupt" rule—is the same in both cases. Moreover, the previous set of plaintiffs asked the court to find that the city had violated the FLSA; the present plaintiffs ask for the same relief. As a result, I also find that the plaintiffs' legal interests are congruent. *See Tice,* 959 F.Supp. at 935 (finding that the plaintiffs' claims were identical and that their legal interests were congruent because they sought the same relief).

When examining the adequacy of representation question, courts may ask whether the same counsel represented both parties. *See Tyus v. Schoemehl,* 93 F.3d 449, 457 (8th Cir.1996), *cert. denied sub nom. Miller v. Schoemehl,* —— U.S. ——, 117 S.Ct. 1427, 137 L.Ed.2d 536 (1997); *Tice,* 959 F.Supp. at 935. If so, there is a finding that "the attorney had 'every reason to prosecute or defend the [prior] case as vigorously' as in the present party's suit." *Tice,* 959 F.Supp. at 935 (quoting *Rush v. Superintendent of Police,* 1994 WL 114847, at *4 (April 4, 1994)). Furthermore, courts look at the similarities between the parties and their claims in determining whether the plaintiffs in the second case were adequately represented: In *Rush,* the court found that because the "two sets of plaintiffs were in the same occupation and sought to challenge the application of the same statutory regulations to their occupation," the second set of plaintiffs' interests were represented in the first action. *Rush,* 1994 WL 114847, at *4.

One of the attorneys in the instant case, Laurie Eggert, was also co-counsel in the previous case. (*See* Mukamal Aff., Ex. 6–C,

¶ 3.) I have no doubt that Ms. Eggert prosecuted the 1988 case vigorously and that she fully explored the compensatory overtime issue. That fact, together with the facts that the plaintiffs are in the same occupation and challenge the same statutory regulation, *see Rush,* 1994 WL 114847, at *4, contribute to my finding that the plaintiffs in this case were adequately represented by Ms. Eggert's previous advocacy.

Because of the identity between the parties to the two cases, I find that the city has shown that the third element of res judicata has been satisfied. I will therefore dismiss the plaintiffs' compensatory overtime claim.

### C. Canine Transportation and Care

#### 1. Transportation

■ Both the police officers and the city have engaged in extensive discussion as to whether the police officers in the canine unit of the police department should be compensated for the time that they spend transporting their dogs to and from work. The police officers have submitted five proposed findings of fact, but they only cite to the plaintiffs' and the defendant's responses to interrogatories, none of which are before the court, as I have noted above.

The plaintiffs, a month and a half after they filed their proposed findings of fact, did submit the affidavit of James Sanfilippo, a former officer in the canine unit of the Milwaukee Police Department. According to the affiant, canine officers are required to take their police cars home and are required to transport the dog to and from work in that car. Mr. Sanfilippo's car was a marked uniform squad car, and he was required to respond to emergency situations while he transported the canine to and from work. (Sanfilippo Aff. ¶ 5.) He also says that the squad car "carried a radio which I monitored at all times while in the squad" and that he notified the police dispatcher when he was "secured for the day." (Sanfilippo Aff. ¶ 5.) During the transport, Mr. Sanfilippo was required "by Rules and Regulations to respond to emergency situations" and to give verbal instructions to the dog "if I were to make a traffic stop or came upon another matter

which required police intervention." (Sanfilippo Aff. ¶ 7.) The canine officer claims that the commute with the dog was "more involved" than a normal commute because he could not make stops along the route and because he had to maintain "physical and emotional contact" with the dog during the commute. (Sanfilippo Aff. ¶ 7.)

Richard Oliva, the supervisor of the canine unit, states in his affidavit that a canine officer who is required to "take any kind of police action while commuting to and from work" is fully compensated because it is an "extension of duty." (Oliva Supp. Aff. ¶ 7.) He also states that a canine officer's attention to and monitoring of a canine during the commute "requires no additional time on the part of the police canine handler other than the normal time required for commuting." (Oliva Supp. Aff. ¶ 7.)

The police officers allege that, as a matter of law, the time that the canine officers spend transporting the dog to and from work is compensable. There is significant authority for the police officers' position. In *Levering v. District of Columbia,* the district court held that canine officers may be compensated when the time spent transporting the dog is "an 'integral and indispensable' part of the officers' duties." 869 F.Supp. 24, 28 (D.D.C. 1994). That court went on to say, however, that "the simple fact that transportation of the canines is required by the employer does not entitle the officers to compensation for travel time." *Id.* at 28–29. The question instead turned on whether the police officers, during the commute were required to provide a significant amount of care to the dogs. *Id.* at 29. The *Levering* court said that a fact that would bolster the plaintiffs' argument would be if the officers were required to drive to and from work without making any personal stops. *Id.*

Another district court in this circuit has explicitly found that such travel time is compensable. That court said that the transportation of dogs was an "integral and indispensable part of the officers' principal duties as canine police officers." *Graham v. City of Chicago,* 828 F.Supp. 576, 582 (N.D.Ill.1993). The court emphasized the fact that the police officers' canine duties began and ended at home and that therefore the transportation of the dogs was neither "preliminary" nor

"postliminary." *Id.* Another district court recently found that canine police officers were entitled to compensation for transportation time because the commute time was an "integral and indispensable" part of their work. *Karr v. City of Beaumont,* 950 F.Supp. 1317, 1322–23 (E.D.Tex.1997). The Texas court emphasized that the police department had a policy of requiring the officers to care for the dogs at their home and to maintain the city provided vehicles. *Id.* at 1223; *see also Reich v. New York City Transit Auth.,* 45 F.3d 646, 652–53 (2d Cir.1995) (finding that the "actual duties" that occur during the commute are compensable as long as they are not de minimis); *Bobo v. United States,* 37 Fed.Cl. 690, 698 (Fed.Cl.1997) (holding that many of the officers' activities during their commute are compensable).

Several cases addressing this issue, however, hold that such time is generally not compensable. *See Jerzak v. City of South Bend,* 996 F.Supp. 840, 847 (N.D.Ind.1998) (stating that plaintiff was not entitled to any overtime for all claims involving the transport of the canine); *Bolick v. Brevard County Sheriff's Dept.,* 937 F.Supp. 1560, 1565–66 (M.D.Fla. 1996) (stating that the canines were "merely four-legged passengers in plaintiffs' cars each day" and that "[n]o significant time or effort is expended in caring for them on the ride to and from work"); *Andrews v. DuBois,* 888 F.Supp. 213, 218–19 (D.Mass.1995) (holding that, generally, commute time is not compensable and that the canine officers should not be paid for "doing what they would have to do anyway"); *Truslow v. Spotsylvania County Sheriff,* 783 F.Supp. 274, 277 n. 5 (E.D.Va.1992) ("[T]he Court holds as a matter of law that defendants were not required to compensate [the plaintiff] for the time he and the dogs spent commuting to or from work, training sessions, and canine demonstrations.").

Most of the courts examining this issue address Section 4 of the Portal-to-Portal Act of 1947. By passing this act, Congress intended to close a loophole in the FLSA under which employees sought compensation for their commute time. *See Graham,* 828 F.Supp. at 579. As a result, under current law an employer does not need to compen-

sate an employee for time spent "walking, riding, or traveling to and from the actual place of performance of the principal activity" or for "activities which are preliminary to or postliminary to said principal activity." 29 U.S.C. § 254(a)(1)–(2).

■ The question then becomes whether the officers' time spent in the police car with the canine is a principal activity or whether it is preliminary or postliminary. As several of the cases mentioned above state, a principal activity is one that is "an integral and indispensable part of the principal activities for which covered workmen are employed." *See Steiner v. Mitchell,* 350 U.S. 247, 256, 76 S.Ct. 330, 100 L.Ed. 267 (1956).

■ A closer look at the cases described above shows that this issue is very fact-intensive. Even the cases that found that the commute time did not fall within the purview of the FLSA focused on the facts of the case before it. I agree that the travel time is not compensable when a dog is a mere passenger during a police officer's commute, but I do not think that all commute time is per se noncompensable. I believe that the FLSA may apply when the officer's activities during the commute so encompass the principal purpose of his employment. Important factors to be considered are whether the officers could not make any personal stops during the commute and "whether plaintiffs are required to provide a significant amount of care to the dogs while traveling." *See Levering,* 869 F.Supp. at 29. Another relevant factor is whether, as a result of transporting the dog, the police officer was required to perform any other professional duties that benefit the employer. *See Reich,* 45 F.3d at 650; *Bobo,* 37 Fed.Cl. at 696.

Mr. Sanfilippo's affidavit suggests that, because he carried the dog in his car, he was required to monitor the police radio during his drive and to inform the police dispatcher when he was "secured for the day." (Sanfilippo Aff. ¶ 5.) He also states that he had to answer emergency calls and give verbal instructions to the canine in the event of a traffic stop. (Sanfilippo Aff. ¶¶ 5, 7.) Furthermore, the canine officer alleges that he was unable to make stops along his commute route because the dog may have been dangerous. (Sanfilippo Aff. ¶ 5.). The city does not dispute these allegations. Instead, it focuses on the fact that canine officers are compensated when they have to take "any kind of police action," but it does not define police action. The city also emphasizes its proposition that some of the canine duties in the car do not add any time to the commute itself.

I believe that a genuine dispute exists on the question of whether the dogs were merely "four-legged passengers," *see Bolick,* 937 F.Supp. at 1565–66, or whether the police officers spend a significant amount of time engaged in canine-related duties. At least part of the officers' commute may be compensable if the city actually requires its canine officers to respond to emergency calls, if the canine officer must maintain contact with the police dispatcher *because* they are transporting the canine, and if the officers are indeed not allowed to make personal stops during the commute.

Mr. Sanfilippo's affidavit, though, is not entirely clear on the question of what the city actually required of him during his commute with the dog. That the city compensates the officers for the "police action" itself may not be enough if the officers are required to be "on call" during the commute because of their dog. Furthermore, the city emphasizes that the officer's "socializing with" (to use Mr. Sanfilippo's expression) and monitoring of the dog during the commute does not add any time to the commute. A longer commute, while relevant, is not the issue; the issue is whether the officer spends a significant amount of time during the commute engaged in canine related activities. If so, the commute may be an integral and indispensable part of his employment.

Because the defendant has not cleared up the issue, I believe that I need more information on the canine officers' duties during the commute and whether these duties were a de minimis part of the transport. *See Reich,* 45 F.3d at 653 (finding that the time spent engaged in active duties while transporting the dog was de minimis and therefore not compensable). In short, there is a genuine dispute as to "whether plaintiff's activities could potentially constitute 'work.'" *Holzap-*

fel v. Town of Newburgh, 145 F.3d 516, 521 (2d Cir.1998). I therefore will not grant either party's motion for summary judgment as to this aspect of the case. The parties will be allowed to present evidence on this issue at the next stage of the proceedings.

### 2. General Canine Care

The plaintiffs' next contention is that the canine officers should be compensated for more than 30 minutes a day of canine care. In his affidavit, Mr. Sanfilippo states that canine officers in the Milwaukee police department are required to care for their dogs while they are off-duty. He also states that this care requires a minimum of 60 minutes per day when the dogs are on-duty and 90 minutes per day when the dog is not on-duty. (Sanfilippo Aff. ¶ 4.)

The city also provided the court, a month and a half after it filed its motion for summary judgment, with the affidavits of Josef Ellis, a former personnel administrator of the police department, and Richard Oliva, the supervisor of the canine unit of the police department. Mr. Ellis testifies that police officers who are members of the canine unit actually work seven and a half hours per day but are paid for eight hours per day. The remaining 30 minutes of compensation is for time spent in off-duty canine care. (Ellis Sup. Aff. ¶ 3.) Mr. Oliva states that there are only currently two officers in the canine unit. (Oliva Aff. ¶ 4.) These officers may perform many of their canine duties while the police officer is on-duty. These duties include canine grooming, exercise of the dog, veterinary examinations, obedience training, and purchase of food, medicines, and other canine supplies. (Oliva Aff. ¶¶ 4–5.) The only canine care duties that a police officer must perform while he is off-duty are feeding and bathing the canine, and clean-up associated with the dog's presence in the officer's home. (Oliva Aff. ¶ 6.)

The city does not dispute that canine care time is compensable. Indeed, the line of cases on this issue clearly establishes that such care is an "integral and indispensable" part of the officer's principal activities as an employee. Holzapfel, 145 F.3d at 522; Rudolph v. Metropolitan Airports Comm'n, 103 F.3d 677, 681 (8th Cir.1996); Reich v. New York City Transit Authority, 45 F.3d 646, 651 (2d Cir.1995); Jerzak v. City of South Bend, 996 F.Supp. 840, 846 (N.D.Ind.1998); Andrews v. DuBois, 888 F.Supp. 213, 216–217 (D.Mass.1995); Levering v. District of Columbia, 869 F.Supp. 24, 26–27 (D.D.C. 1994); Truslow v. Spotsylvania County Sheriff, 783 F.Supp. 274, 277–78 (E.D.Va. 1992).

What the city instead argues is that the 30 minutes a day of compensation for canine care is reasonable under the FLSA. As support for this reasonableness requirement, the court relies on a district court case that has since been overturned by the court of appeals for the second circuit. Holzapfel, 145 F.3d 516. The district court had instructed the jury that a canine officer could be compensated for canine care hours that were "reasonably related" to the job's requirements. Id. at 522. The second circuit reversed the district court in part and said that the better factual question is "whether the amount of time was required by the employer." Id. at 523. If not, the Holzapfel court said that the jury should still ask whether the employee "expended this time primarily for the benefit of the employer" or if the employee was "motivated primarily by his or her own pleasure." Id.; but see Jerzak, 996 F.Supp. 840, 846 ("In order to be compensable, the amount of overtime an employee claims to have spent on efforts related to the employee's principal activities must be reasonable.").

I agree with the court of appeals for the second circuit that the proper test is not "reasonableness." An employee should still be compensated for "work," even if the work may appear unreasonable. See Holzapfel, at 522. I also believe, however, that the city should not have to pay for all of the time that a canine officer spends with the dog. My discussion above on the transportation question focused on what the city actually required of the officer during the commute. Similarly, I believe that the first question here should focus on whether the city *requires* the canine officers to do more than 30 minutes of canine work per day. If so, the officers should be compensated for that time. I also think that the second Holzapfel question—whether the officer's time spent with the dog is for his own benefit or

for his employer's benefit—is relevant. *Id.* at 523. Finally, there is the third consideration of whether the employer knew about the employee's activities with the canine. *Id.* at 524; *Truslow,* 783 F.Supp. at 279.

The police officers have met their burden of demonstrating that they are entitled to a court trial on damages in their attempt to show that they are entitled to more than 30 minutes of compensation per day for their canine care. Mr. Sanfilippo states in his affidavit that canine officers spend a minimum of 60 off-duty minutes a day caring for the dog on the days when the dog works with the officer and a minimum of 90 off-duty minutes a day on the days when the officer and the dog do not work. (Sanfilippo Aff. ¶ 4.) Other than dispute how long it takes to get the dog ready for the day during their off-duty hours, the city provides nothing to challenge this overall estimate.

Also, there is evidence that the city requires the officers to care for the canines in a particular manner during their off-duty hours. The "Canine Unit Standard Operating Procedure" attached to Mr. Sanfilippo's affidavit states that "handlers shall ensure that the canine receives proper and responsible care, food, and exercise." (Sanfilippo Aff.) Furthermore, while Mr. Oliva states that canine officers can do most of their canine care duties while they are on-duty, he also acknowledges that there are some duties, "which by their nature," can only be performed while the officer is off-duty. (Oliva Aff. ¶ 6.) These documents also show that the city had actual or constructive knowledge that the canine officers, for some period of time that may be disputed, engaged in this activity. *See Holzapfel,* at 525 (finding that the chief of police's acknowledgment that the police officers had to spend off-duty hours caring for their dogs was sufficient evidence of the defendant's actual and constructive knowledge).

Therefore, I will grant to the plaintiffs a partial summary judgment on the canine care issue. They will be allowed to present evidence and argue, using the guidelines set forth above, that canine officers are entitled to more than 30 minutes per day of compensation for their canine care.

### D. Other Travel Time

The plaintiffs' next allegation is that the city violates the FLSA by not compensating officers for "required travel time from the seven (7) City police precincts to Community Service Offices (time from one work location to another)." (Compl.¶ 21.)

During the initial stages of briefing, there seemed to be much confusion between the parties as to what exactly the plaintiffs' claim was. At first, the city seemed to think that the claim related to the officers' commute between their home and the safety academy. (*See* Def.'s Brief in Support of Summ. J. Mot., at p. 68.)

In response to this confusion the plaintiffs responded that what they were actually complaining of was the fact that police officers were uncompensated for the drive time between their picking up of and parking of squad cars at the seven district stations and the "community based substations" at which they worked. The officers claim that there was insufficient parking for the squad cars at the substations. (Pls.' Brief in Resp. to Def.'s Mot. for Summ. J., at pp. 26–27.)

Again, I can adopt none of the police officers' proposed findings of fact on this issue because they are all based on evidence that is not before the court. They did, though, provide two affidavits at a later date. The first affiant is Bobbie Durrah, a recently retired police officer, who states that he was assigned to "District # 5," but that his actual work location was a substation. He also claims that he needed a department vehicle to perform his duties. (Durrah Aff. ¶ 3.) As a result, he drove his own car to the district and picked up a department vehicle to drive to the substation so that he could be there for the beginning of his shift. He was not compensated for the time he drove his vehicle between the district and the substation. (Durrah Aff. ¶ 3.) He claims that although he was not ordered to do this, his supervisors knew of the practice. He was not allowed to drive the department vehicle to his home. (Durrah Aff. ¶ 4.) He states that other officers who were assigned to the same work location followed a similar practice. (Durrah Aff. ¶ 5.)

The second affiant is Edward Heidemann, a Milwaukee police officer who was assigned to the senior citizens unit/criminal investigation bureau from 1993 until 1996. (Heidemann Aff. ¶¶ 1–2.) He claims that for part of that period he drove his own car to District # 6 and picked up a squad car to drive to the Police Administration Building. Mr. Heidemann used the squad car during the day; it was necessary to the completion of his duty at the senior citizens unit. (Heidemann Aff. ¶¶ 2, 4.) At the end of the day, he returned the car to the district. (Heidemann Aff. ¶ 2.) When Mr. Heidemann was first assigned to that unit, he "was told" to follow that procedure. Other detectives and police officers assigned to his unit also used squad cars in the same manner. His supervisors knew of that practice. (Heidemann Aff. ¶ 3.)

After the plaintiffs' provided these affidavits, the defendant agreed that "these categories of police officers are required to utilize Department vehicles in the course of their work, and do, from time-to-time, transport those vehicles between various work locations within the Department." (Def.'s Reply to Def.'s Mot. for Summ. J., at p. 13.) Accordingly, they conceded that officers assigned to the senior citizens unit and the background investigation unit have not been compensated, but that they should be.

The city argued, however, that all officers assigned to substations have already been compensated for their time. (Def.'s Reply to Def.'s Mot. for Summ. J., at p. 13.) To support this allegation, the defendant has provided the affidavit of Roger Reinke, the personnel administrator for the police department. He states that all officers assigned to substations, other than those who were assigned to the background investigation unit and the senior citizens unit, appeared at their *district* for roll call at the beginning of their shift. (Reinke Aff. ¶ 8.) From there, the officers would report to the substations. They would use several modes of transportation, including driving a department vehicle to the substation. (Reinke Aff. ¶¶ 8–9.) These officers' compensation began, Mr. Reinke states, at their roll call at the district, not at the substation. (Reinke Aff. ¶¶ 8–9.)

Based on this information, I will grant the plaintiffs' motion for summary judgment on this issue as to the officers assigned to the background investigation unit and the senior citizens unit. The parties may address the damages portion of this claim at the next stage of the proceedings. I will also grant the defendant's motion for summary judgment on this issue as to the officers assigned to the other substations. The plaintiffs' have not provided the court with any evidence regarding the compensation for these other officers, and the defendant has made an adequate showing that these officers were indeed compensated for their travel time between the district and the substation.

### E. Sick and Injured Leave

The police officers next challenge the city's policy of requiring officers on sick leave or injury pay status to remain on home confinement. Police officers who have accumulated balances in their sick leave account may receive "sick leave with pay." Officers who have exhausted their sick leave balance receive "sick leave without pay." (DPFF ¶ 52; Linestedt Aff. ¶ 10.) Injury pay is a benefit paid to officers in lieu of worker's compensation benefits. (DPFF ¶ 53; Linestedt Aff. ¶ 11.)

The home confinement policy requires that officers on sick leave or injury pay status may not leave their residence without obtaining permission, but provides that the department will grant permission for several specific purposes, including attending a doctor's appointment, purchasing food, attending religious services, and exercising. (DPFF ¶ 58; Linestedt Aff., Exs. 3–A, 3–B.) Police officers make the decision when to go on sick leave or injury pay status. (DPFF ¶¶ 55–56.) An officer's decision to go on sick leave status is subject to the police department's right to require medical substantiation from the officer's doctor; an officer's decision to go on injury pay status is subject to a review by the city's department of employee relations. (DPFF ¶¶ 55–56.)

The plaintiffs claim that the city should, pursuant to the FLSA, compensate them for the time that they are confined to their residence. The crux of their argument is that because the city's regulations forbid officers from engaging in personal pursuits while on

sick leave or injury pay status, the city is controlling the officers to such a degree that they should be compensated. They acknowledge that the city is not required to credit sick or injury leave as work time or to provide paid sick or injury leave at all, but they argue that because the city does provide these benefits, along with the accompanying restrictions, the officers are "engaged to work" and are therefore controlled by the city.

The plaintiffs' basic problem is that they have simply failed to support their claim. Even if I agreed with their basic proposition—that the city's requiring the police officers to stay home falls within the scope of the FLSA—I could not grant their motion for summary judgment. The plaintiffs only cite to the basic law that applies to employees who are "engaged to work" because they are on-call. They do nothing to show that their personal pursuits are in fact restricted while they are on home confinement. *See Owens v. Local No. 169*, 971 F.2d 347, 350–51 (9th Cir.1992) (describing the factors to be considered when examining whether the time spent "waiting to work" is primarily for the benefit of the employer). For example, the plaintiffs have provided me with no affidavits from any officers claiming that they are unable to use the time for their own purposes.

As I noted above, the plaintiffs must raise a genuine issues of material fact as to each of their claims "by substantial evidence." *First Pac. Networks, Inc. v. Atlantic Mut. Ins. Co.*, 891 F.Supp. 510, 513 (N.D.Cal.1995). They have not done that here, and their failure to do so allows me, on these cross-motions for summary judgment, to grant the defendant's motion on this claim and to deny the plaintiffs' motion for summary judgment on that claim.

### F. Attendance at Disciplinary Hearings or Meetings

■ The police officers' last claim is that they should be compensated for their appearance at "Loudermill hearings" held before the chief of police or the assistant chief of police. (Compl.¶ 20(ii).) The court presumes that the plaintiffs' use of the term "Loudermill hearings" refers to *Cleveland Board of Education v. Loudermill*, 470 U.S. 532, 544–45, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985), in which the Supreme Court held that public employees are entitled to pre-termination hearings. The parties in the instant case refer to "pre-disciplinary hearings" or "pre-disciplinary meetings" that are held prior to the chief of police's decision whether to impose charges and discipline against an officer. (DPFF ¶ 63; PR, at p. 8a.)

Police officers and their witnesses have not been credited with "hours worked" for their appearance at pre-disciplinary meetings when the appearance fell outside of the hours of the regular work schedules. (Plaintiffs' Proposed Findings of Fact ["PPFF"] ¶ 9; Defendant's Response to Plaintiffs' Proposed Findings of Fact ["DR"] ¶ 9.) A police officer's attendance at the pre-disciplinary meeting was always voluntary; the city never required officers to attend. (DPFF ¶ 66; Ellis Aff. ¶ 25.) The police department discontinued the use of pre-disciplinary meetings in December 1996. (DPFF ¶ 64; PR, at p. 8a.)

The police officers have not met their burden of proof on this issue. First, they do not dispute that the city does not formally require the officers to attend the hearings. They instead argue that an officer's only real choice was to attend the hearings because the charges against him may otherwise be presumed to be true. Aside from the fact that the plaintiffs have provided no evidence to prove this proposition, I do not see how an employer's allowing an employee to attend a meeting or a hearing is the same as the employer's controlling or requiring the loss of that employee's time. *See Reich v. New York City Transit Authority*, 45 F.3d 646, 651 (2d Cir.1995) ("[A]n activity constitutes 'work' (compensable under the FLSA) if it involves physical or mental exertion (whether burdensome or not) *controlled or required by the employer* . . . .") (emphasis added) (citations and internal quotations omitted).

■ The plaintiffs' second problem is similar to the problem with their home confinement argument: even if they had persuaded me that the city required or controlled their appearance at the pre-disciplinary meetings, the police officers have not shown how their personal freedom was at all infringed by the alleged work-related

activity. "Whether an off-duty activity is conducted predominately for the benefit of the employer depends on the degree to which an employee's freedom is undermined by the work-related activity." *Dade County v. Alvarez*, 124 F.3d 1380, 1384 (11th Cir.1997). As a result, I will grant the city's motion for summary judgment on this issue and deny the plaintiffs' motion for summary judgment on this issue.

### Conclusion

The plaintiffs may proceed on the liability question of whether canine officers should be compensated for the time spent transporting canines. If necessary, the court will also address the damages question on that issue. I will also allow the police officers to go forward on the question of how much compensation canine unit officers are entitled to for their off-duty care of canines. Finally, the plaintiffs' may also proceed on the damages phase of their claim that officers assigned to the background investigation unit and the senior citizens unit are entitled to compensation for their travel time between the district and the substation.

Therefore, IT IS ORDERED that the city's motion to dismiss the Milwaukee Police Association as a plaintiff be and hereby is granted.

IT IS ALSO ORDERED that the city's motion to strike the plaintiffs' proposed findings of fact be and hereby is denied.

IT IS FURTHER ORDERED that the plaintiffs' motion for partial summary judgment be and hereby is granted in part and denied in part

IT IS FURTHER ORDERED that the defendant's motion for partial summary judgment be and hereby is granted in part and denied in part.

IT IS FURTHER ORDERED that the plaintiffs be and hereby are granted partial summary judgment and the defendant be and hereby is denied partial summary judgment on the plaintiffs' claim that the city is liable to officers who were assigned to the background investigation unit and the senior citizens unit and who were not compensated for their travel time between the district and the substation.

IT IS FURTHER ORDERED that the plaintiffs be and hereby are granted partial summary judgment and the defendant be and hereby is denied partial summary judgment on the issue of whether canine unit officers are entitled to compensation for canine care.

IT IS FURTHER ORDERED that the plaintiffs and the defendant be and hereby are denied partial summary judgment on the plaintiffs' claim that canine unit officers are entitled to compensation for their commute with the canine.

IT IS FURTHER ORDERED that the defendant be and hereby is granted partial summary judgment and the plaintiffs be and hereby are denied partial summary judgment on the plaintiffs' compensatory overtime claims.

IT IS FURTHER ORDERED that the defendant be and hereby is granted partial summary judgment and the plaintiff be and hereby is denied partial summary judgment on the plaintiff's claims that other officers, other than those assigned to the background investigation unit and the senior citizens unit, are entitled to compensation for their travel time between the district and the substation.

IT IS FURTHER ORDERED that the defendant be and hereby is granted partial summary judgment and the plaintiffs be and hereby are denied partial summary judgment on the plaintiffs' claim that they are entitled to compensation for the time that they spend in "home confinement" while on sick leave or injury paid status.

IT IS FURTHER ORDERED that the defendant be and hereby is granted partial summary judgment and the plaintiffs be and hereby are denied partial summary judgment on the plaintiffs' claim that they are entitled to compensation for their appearance at pre-disciplinary meetings.